**Joe CARRABBA, Jr., et al., Individually and on Behalf of All Others Similarly Situated, Plaintiffs,**

v.

**RANDALLS FOOD MARKETS, INC., Defendant.**

**No. 4:96–CV–651–A.**

United States District Court,
N.D. Texas,
Fort Worth Division.

Feb. 18, 1999.

Robert Lee Wright, William Whitchill, and Elaine A. Murphy, Gardere & Wynne,

---

Dallas, TX, Thomas Francis Dunn, Dunn & Roark, Arlington, TX, for plaintiffs.

Robert Lee Wright, Gardere & Wynne, Dallas, TX, for Barbara A. Williams, Loyd Wellesley, Willard P. Correll, Sr., Bruce Philpot, J. Bruce Gray, Rick Williams, Joe Cutrer, Roberto G. Fermamdez Vinas, Thomas D. McCarthy, Wylie Holmes, Dave Fortner, Jack D. Neal, Floyd E. Fulcher, Michael Chessmore, Ima Dell Irvin, Gregory E. Smith.

Elaine A. Murphy, Gardere & Wynne, Dallas, TX, for Jack W. Sprabary, Robert L. Stockton, Carroll E. Brown, Michael J. Hammer, Scott E. Peterson, William H. Mansfield, Jr., James S. Standifer, Bettie J. Garrett, Cherie J Stowe, Arvil R Martin, Jr., Sanford W. Maynard, Denise P. Miller, Everett G. Grosgebauer.

George Walter Bramblett, Jr., Thomas Joseph Williams, Haynes & Boone, Dallas, TX, for Randalls Food Markets Inc.

## MEMORANDUM OPINION and ORDER

McBRYDE, District Judge.

On October 26, 1998, the court conducted a non-jury trial on the issue of whether the employee pension benefit plan known as the Management Security Plan for Cullum Companies ("MSP"), of which the named plaintiffs and the class of persons they represent in this action ("Class") were participants, was "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees," as those words are used in 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1). After having considered the contents of the Pre–Trial Order for Trial of Class Issue filed October 23, 1998, the evidence received at the non-jury trial (including contents of deposition summaries that were tendered by the parties), and the oral and written submissions by the parties, the court has concluded that it cannot find from a preponderance of the evidence that the MSP was maintained by an employer primarily for such a purpose.

I.

*Nature of Litigation and Events That Led to the Trial of the Issue Defined Above*

Generally stated, this is an action brought by the named plaintiffs [1] claiming that Randalls Food Markets, Inc., as the successor employer sponsoring the MSP [2], failed to provide benefits due and owing to them and other persons similarly situated under the MSP when it terminated the plan. Plaintiffs contend that retirement benefits accrued under the MSP were wrongfully forfeited and withheld, and are being denied to them and others similarly situated in violation of the applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U .S.C. §§ 1001–1461. They contend that the MSP was subject to the vesting, funding, trusteeship, and reporting provisions of ERISA; and, they seek to recover individually and on behalf of

---

**1.** The named plaintiffs are Carroll E. Brown, Robert H. Burrows, Jr., Joe Carrabba, Jr., Michael Chessmore, Dave Cooper, Willard P. Correll, Sr., A. Joe Cutrer, Roberto G. Fernandez–Vinas, Rafael Ferrer, Jr., Ed Fortner, Floyd E. Fulcher, Bettie J. Garrett, J. Bruce Gray, Everett G. Grosgebauer, Michael J. Hammer, Wylie B. Holmes, Ima Dell Irvin, William H. Mansfield, Jr., Arvil R. Martin, Jr., Sanford W. Maynard, Thomas O. McCarthy, Craig McKnight, Joe W. Melton, Denise P. Miller, Jack D. Neal, Scott E. Peterson, Bruce Philpot, Gregory E. Smith, Jack W. Sprabary, James S. Standifer, Robert L. Stockton, Cher-

ie J. Stowe, Loyd Wellesley, Barbara A. Williams, and Ricky Williams.

**2.** The record does not make clear the relationship between Randalls Food Markets, Inc., and the MSP at the time the MSP was terminated. However, the effect of stipulations made by the parties is that Randalls Food Markets, Inc., will be deemed to have been the sponsoring employer of the MSP at the time of its termination and the entity that will be held liable if there was a mishandling of plan assets and obligations at the time of and after the termination of the plan.

those similarly situated the present value of what they maintain should have been their accrued, vested benefits as of the MSP's termination date, as well as pre-judgment and post-judgment interest and attorneys' fees incurred by them in this action.

Defendant contends that plaintiffs and the other persons similarly situated received all, or more than, the benefits to which they were entitled under the MSP. According to defendant, the MSP is what commonly is called a "top hat" plan, which is statutorily defined as a plan "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1). If the plan were to qualify as a top hat plan, it would be exempt from important ERISA requirements, including vesting, funding, trusteeship, reporting, and disclosure. *Id.*

On June 16, 1998, the court signed an order determining that this action should proceed as a class action for the determination of the issue of whether the MSP qualified as a top hat plan, with the remaining issues to be resolved by future proceedings, as appropriate. The court defined the Class as:

> All persons who on the date of the termination of the Management Security Plan for Cullum Companies, Inc., ("MSP") were participants in the MSP and were employed by Randall's Food Markets, Inc., and everyone who is a beneficiary of such a person who is deceased.

1/16/98 Order Certifying Class at 2. The only issue to be dealt with initially on a class basis was defined as follows:

> Was the Management Security Plan for Cullum Companies, Inc., "a plan which [was] unfunded and [was] maintained by an employer primarily for the purpose of

providing deferred compensation for a select group of management or highly compensated employees," as those words are used in 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1)?

*Id.* The court resolved summarily against plaintiffs and the Class the sub-issue of whether the MSP was unfunded within the meaning of 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1). *See* 6/5/98 Mem.Op. & Order and 9/9/98 Order at 2. That left to be tried at the October 26, 1998, trial the sub-issue of whether the MSP was "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees," as those words are used in ERISA. The parties agreed that defendant had the burden of persuasion on that sub-issue.

## II.

### *Nature and History of the MSP*

The MSP was established in 1974 by Cullum Companies, Inc., to provide death and retirement benefits to some of the employees of Cullum Companies, Inc., and its subsidiaries. The parties agree that the MSP was an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2)(A) by virtue of the fact that it is a plan, fund, or program which was established or maintained by an employer to provide retirement income to employees, or to provide for a deferral of income by employees for periods extending to the termination of covered employment or beyond.

The text of the plan as it initially existed is not in the record, though the record does contain a copy of an agreement between one of the plaintiffs and Cullum Companies, Inc., by which he became a participant in the plan (known at that time as the "Management Security Program").[3]

---

**3.** The parties stipulated that a "true and correct copy of the 1974 basic plan document is identified as Carrabba Exhibit 88." 10/23/98

Pre–Trial Order for Trial of Class Issue at 14. The document received into evidence as Agreed Exhibit 1 appears to be the same as

There were two revisions of the plan, first in 1979 and then in 1984. The 1979 revision recited that the purpose of the plan was to "provide specific benefits to a limited group of management employees who contribute materially to the continued growth, development, and future business success of Cullum Companies, Inc. and its subsidiaries." Agreed Ex. 2 at 1. The 1984 version said the purpose of the plan was "to provide specified benefits to a select group of management and highly compensated employees who contribute materially to the continued growth, development and future business success of Cullum Companies, Inc. and its subsidiaries," and stated as the intention of Cullum Companies, Inc. "that this program and the individual plans established hereunder be administered as unfunded welfare benefit plans established and maintained for a select group of management or highly compensated employees." Agreed Ex. 3 at I–1. Each plaintiff and Class member was required, as a condition to becoming and remaining a participant in the plan, to defer a portion of his or her annual compensation.

Periodically Cullum Companies, Inc., distributed to employees eligible to participate in the MSP information pertaining to the plan. One of those items was a set of questions and answers, which said under the heading "Exactly What Is The Plan?" that:

> The Cullum Companies, Inc. Management Security Plan (CULLUM MSP) is a company approved and sponsored employee benefit program offered to a select group of key employees. If you elect to become a participant, CULLUM will pay you or your family certain portions of your salary in the event of your retirement or death.

Carrabba Exhibit 88. However, even though it bears the title "Cullum Companies, Inc. Management Security Agreement," the document shows on its face that it is only an agreement between Cullum Companies, Inc., and Joseph Carrabba, Jr. The first paragraph of the document says that it is an agreement being entered into "for the purpose of enroll-

Agreed Ex. 6. In a memo sent by Cullum Companies, Inc., to the plan participants in March 1990, the company gave the following description of the nature and purpose of the plan:

> The Management Security Plan is a Company sponsored benefit program offered once a year to Store Directors, Pharmacists, eligible staff members and current participants. This plan is designed as a way to accumulate wealth on a before tax basis, cut your current tax liability and provide substantial retirement and survivor benefits.

Agreed Ex. 31.

The plan was managed and administered by an administrative committee, the members of which also served as the executive committee of Cullum Companies, Inc. The administrative committee, following recommendations made to it by the personnel office of the corporation, determined the identities of the employees of the company who would be invited to participate in the plan. That was done once a year. Generally, the employees who were identified by the personnel department as ones eligible to participate in the plan were approved by the administrative committee for participation.

The MSP was terminated in the year 1992 after Cullum Companies, Inc., was acquired by Randalls Food Markets, Inc., or one of its subsidiary or affiliated corporations.

## III.

### *Intent of the Executive Officers of Cullum Companies, Inc. in Establishing the MSP*

As Charles Cullum, one of the founders of Cullum Companies, Inc., testified, the ing Employee in the Management Security Program (hereinafter referred to sometimes as 'MSP')." Agreed Ex. 1 at 1. Perhaps there was no master agreement before 1979, and the MSP consisted of a series of individual agreements between Cullum Companies, Inc., and individual employees prior to 1979.

intent of Cullum Companies, Inc., in establishing the MSP was to provide additional benefits in the form of deferred compensation to people who were key employees throughout the company. It was designed to meet the "top hat" provisions of ERISA. Throughout the plan's existence, the executives of the corporation intended the MSP to be a top hat plan, and thought it was. The company officials relied on the expertise of Fred F. Wiedemann and his associates in formulating the MSP and advising them to the end of insuring that it was a top hat plan, exempt from the ERISA requirements. Mr. Wiedemann informed Mr. Cullum by letter in January 1975 that ERISA "clearly exempts the Cullum Companies Management Security Plan from nearly all the provisions of [ERISA]." Defs.' Ex. 1. In an August 14, 1975, letter to Cullum Companies, Inc., Mr. Wiedemann represented to the corporation that the "requirements" of the top hat provisions of ERISA had been met "under your plan." Defs.' Ex. 2 at 2.[4]

Houston E. Holmes, Jr., who became general counsel of Cullum Companies, Inc., in 1972, participated in evaluating and approving the plan in 1974. In addition to becoming a member of the MSP, he served on the administrative committee that administered the plan. He concluded from his review in 1974 of the plan and its operation that it was a top hat plan. From the time the plan was adopted in 1974 until he ceased employment in 1992, his understanding was that the MSP was a top hat plan. There was no intent by Cullum Companies, Inc., to change the status of the plan by the adoption of the 1979 and 1984 revisions in the plan. Mr. Holmes considered that part of his job as general counsel of Cullum Companies, Inc., was to maintain the MSP as a top hat plan; and, he was satisfied that the people who were admitted into the plan satisfied that general purpose.

IV.

*The Nature of the Businesses
of the Plan Sponsor*

When the plan was adopted, Cullum Companies, Inc., was engaged in the food and drug retailing and distribution, meat packing, and real estate businesses. In 1974, Cullum Companies, Inc., and its subsidiaries operated 113 supermarkets in Nebraska, Iowa, South Dakota, Kansas, Missouri, Texas, and California; twenty-one drug stores and a wholesale food division in Dallas, Texas; and meat packing operations in Abilene and Midland, Texas. By 1978, Cullum Companies, Inc., had expanded, apparently through subsidiaries, into the institutional wholesale foods and real estate businesses. Its business operations remained basically the same until the mid-1980s when it sold its operations in the Midwest and in California, but made major expansions in its food and drug operations in the State of Texas, operating under the names "Tom Thumb–Page," "Tom Thumb," "Page Drugs," "Gooch Packing Company," and "Cullum Development Co."

Through a series of corporate reorganization transactions, Cullum Companies, Inc., became an affiliate or a subsidiary of Randalls Food Markets, Inc., in the sum-

4. The evidence suggests that there is a possibility that there was a miscommunication, or lack of communication, between Mr. Wiedemann and his associates, on the one hand, and Cullum Companies, Inc., on the other, concerning eligibility requirements actually used by Cullum Companies, Inc., in operation of the plan. In his January 7, 1975, letter Mr. Wiedemann said that the "Plan is designed so that it is restricted to a specific salary management level...." Defs.' Ex. 1. In fact, in 1974 and 1975, Cullum Companies, Inc., was offering enrollment in the plan to all salaried employees and all members of management. In Mr. Wiedemann's August 14, 1975, letter, he said that the MSP satisfied the requirement that the plan be maintained by an employer "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." Defs.' Ex. 2 at 1–2. The court cannot determine whether Mr. Wiedemann was writing in the context of the method by which the plan was actually being operated as opposed to a misunderstanding of the mode of operation of the plan.

mer of 1992. As a part of those transactions, the name of the company was changed to "Tom Thumb Food & Drugs, Inc." As of that time, the corporation and its subsidiaries operated thirty-six Tom Thumb–Page Food & Drug Centers (which are large combination stores that carry a broad range of merchandise offered to retail customers), twenty-two Tom Thumb Supermarkets, sixteen Page Super Drug Stores, three Simon David full-service gourmet supermarkets, and one discount drug store operating under the name "Drugs Plus." And, the company had two distribution centers, one that had gone into operation in 1974 and the other in 1987, which supplied over seventy percent of the products sold in the company's retail stores. The merchandise was shipped from the distribution centers to the retail outlets by use of a large fleet of company-owned trucks, including more than one hundred unrefrigerated trailers and sixty-four refrigerated trailers.

The parties entered into a stipulation concerning the total number of employees of Cullum Companies, Inc., and its subsidiaries for the years 1974 through 1992. The total number was 5,000 in 1974, increasing to slightly more than 10,000 in 1981, and thereafter fluctuating between 9,000 to 11,000 through the year 1992. Approximately one-half of those employees, at least for the years 1980 through 1992, were part-time employees.

## V.

*The Employees of Cullum Companies, Inc. Who Were Eligible to Participate, and Those Who did Participate, in the MSP*

The wording of the 1979 and 1984 versions of the MSP is broad enough to allow for participation in the plan of all otherwise eligible employees of all business activities of Cullum Companies, Inc., and its subsidiaries. However, in actual operation of the plan, participation in the plan was available only to certain employees of Cullum Companies, Inc., and its subsidiaries who worked in Texas in the corporate headquarters departments, the retail stores, the warehouses, and the field operations. The record does not reflect the total number of persons employed in Texas in those business activities at any point in time. The court assumes that a very significant number of the total employees of Cullum Companies, Inc., and its subsidiaries during the years 1974 through 1984 were Texas employees, but in fact the court can only engage in speculation on that subject. However, the record indicates that after the mid–1980s, when Cullum Companies, Inc., sold its business activities in the Midwest and in California, the great majority, if not all, of the employees of Cullum Companies, Inc., and its subsidiaries were Texas employees who, if otherwise eligible, would be permitted to participate in the MSP.

From the beginning in 1974 through the date of the revision of the MSP in 1984, all salaried employees of the operations of Cullum Companies, Inc., to which the MSP applied were invited to participate in the plan. The nature of the grocery business is such that all employees who were salaried were in management at some level. In 1974 ten to twenty percent of the persons employed in the typical supermarket would be salaried. The salary information in the record before the court is incomplete. The information that has been provided shows that the MSP participants in the first year of its operation, 1974, had salaries ranging anywhere from $11,180.00 to $40,000.00 annually, with only one above $30,000.00, only three above $20,000.00, three at $20,000.00, and the remainder less than $20,000.00. More complete information is provided for the years 1975 through 1983. There appear to have been increases in salary levels each year during those years commensurate with the inflationary pressures existing at that time. By 1983 all but two of the plan participants were earning more than $20,000.00 per year, many had an annual salary in excess of

$30,000.00, and several in excess of $40,000.00.

The executive officers of the corporation were slow to become involved as participants in the plan, particularly those who were in the top salary range.[5] Executives who enrolled in 1974 were Mr. Badley, vice president/treasurer, with a salary of $27,500.00; Mr. Corn, vice president/district manager, with a salary of $18,500.00; Mr. Dawson, vice president/data processing, with a salary of $20,000 .00; Mr. Hairston, executive vice president, with a salary of $40,000 .00; Mr. Knutson, vice president/Page Drug, with a salary of $30,000.00; and Mr. Rutledge, vice president/director of internal audit, with a salary of $21,000.00. The next executive officer to become a participant was Mr. Evans, president and chief operating officer, who joined in 1976, when his salary was $80,000.00. Next came Mr. Cutrer, executive vice president/Rylanders, whose salary when he joined in 1979 was $37,500.00. The next executive to join was Mr. Holmes, vice president/general counsel, who became a participant in 1982 when his salary was $70,000.00. The next, and final, executive officers to become members were Mr. Charles Cullum, chairman of the board, who became a member in 1984 when his salary was $250,000.00, Mr. Gooch, president/Gooch Packing, in 1984 when his salary was $125,000.00, and Mr. Garretson, vice president/grocery merchandising, in 1984 when his salary was $67,500.00.[6]

All levels of management were represented by the participants in the plan during the years 1974 through 1983, starting with executive officers of the company, going down to division managers (who managed more than one store), to store directors (or store managers), to co-store directors (co-store managers), to assistant store directors (assistant store managers), and to managers of departments within the stores, managers in the warehousing operations, managers in the executive office operations, and supervisors over various other business functions.

Starting in 1984, to become a new participant in the MSP the employee had to have an annual salary of at least $25,000.00. That eligibility criteria existed during the years 1984, 1985, and 1986. During those years the range of levels of management participating in the plan and the range of salaries of participants, taking into account the naturally occurring across-the-board increases in salaries, were similar to the ranges existing in prior years. Throughout the years 1974 through 1986, Cullum Companies, Inc., considered everyone who had any level of management to be a key employee of the company. The goal was to make participation in the MSP available to all of those key employees.

The eligibility requirements for participation in the plan were tightened in the year 1987, and again in the years 1988, 1989, 1990, and 1992. In 1987 eligibility was limited to (1) store directors and pharmacists at retail locations, (2) employees at the Inwood Road Center (the executive office of Cullum Companies, Inc.)

---

5. The parties stipulated that in 1974 "the Company" (which the court assumes has reference to Cullum Companies, Inc.) established another retirement plan, the second one known as the "Senior Corporate Officers' Plan," which, according to the stipulation, was a plan for high-level executives, had fewer than seven members, all of whom were members of the board of directors or executive committee members, and was non-contributory. 10/23/98 Pre-trial Order for Trial of Class Issue at 15. The trial record does not contain further information concerning the purpose of, or benefits provided by, this second plan.

6. The court is not mentioning employees who became participants in the plan when occupying a lower level of management but later were promoted to executive positions. For example, omitted is Mr. Brooks Cullum, who became a member of the plan in 1974 when he was a division manager earning a salary of $23,000.00 per annum, and who, by no later than the 1979 plan year, was a vice president with a salary of $42,000.00.

who were either officers, division managers, merchandisers, department directors, assistants to department directors, or persons with a base salary minimum of $45,000.00, and (3) all then-current MSP participants (as of January 1, 1987) who did not meet the new eligibility requirements (who were to be allowed to continue to participate in the plan without any modification). The only changes in 1988 were to add a new subcategory of "field merchandisers" to the "Inwood Road Center" group, to eliminate from the general "Inwood Road Center" group the subcategory having to do with a base minimum salary of $45,000.00 annually, and to add a new general category "Selected Key Staff with a base salary minimum of $50,000.00 annually." Agreed Ex. 10. In 1989 the base minimum salary was raised to $55,000.00; in 1990 it was raised to $60,000.00; and in 1992 the "pharmacists" designation in the "Retail Location" group was changed to "full-time pharmacists." Agreed Ex. 14. Otherwise, the eligibility criteria stayed the same.

The record does not reflect, on an annual basis or otherwise, the number of employees of Cullum Companies, Inc., who were eligible to participate in the MSP under the criteria for participation as they existed from time to time. However, there is indication in the record that there probably were a significant number of persons eligible to participate who did not actually participate. Apparently the eligible employees had to be sold on the notion of participating in the MSP. The largest new enrollment in the MSP was in the year 1984, after the benefits were improved, while the company was growing rapidly, and had "a new insurance consultant that did a better job presenting the program to eligible people." Tr. 50–51. The number of new enrollments in the plan each year, starting with 1974 going through 1991, were as follows: 1974, 57 new enrollees; 1975, 17 new enrollees; 1976, 15 new enrollees; 1977, 5 new enrollees; 1978, 1 new enrollee; 1979, 55 new enrollees; 1980, 51 new enrollees; 1981, 16 new enrollees;

1982, 34 new enrollees; 1983, 2 new enrollees; 1984, 168 new enrollees; 1985, 67 new enrollees, 1986, 98 new enrollees; 1987, 27 new enrollees; 1988, 18 new enrollees; 1989, 8 new enrollees; 1990, 13 new enrollees; and 1991, 23 new enrollees. Perhaps as an indication of a shift in the emphasis of the corporation's business, all but thirteen of the new enrollees in the years 1987 through 1991 were pharmacists or pharmacy managers.

As new participants joined the plan, some of the existing participants terminated participation for one reason or another. The net cumulative numbers of participants in the plan on a plan-year basis are as follows: 1974, 57 participants; 1975, 68 participants; 1976, 72 participants; 1977, 70 participants; 1978, 63 participants; 1979, 113 participants; 1980, 153 participants; 1981, 160 participants; 1982, 188 participants; 1983, 186 participants; 1984, 346 participants; 1985, 395 participants; 1986, 447 participants; 1987, 441 participants; 1988, 431 participants; 1989, 356 participants; 1990, 331 participants; 1991, 328 participants; and 1992, 297 participants (with 247 participants on the date when the plan was terminated).

All of the MSP participants were viewed by the officials of the corporation to be important to the day-to-day operations and activities of the company. As a group, they were all important to the business and policy decisions of the company. Starting with the changes made in 1987, the changes in the criteria for eligibility to participate in the plan were in response to a thought by the officials of the corporation that the plan should be more restrictive, and because of profit pressure. Nevertheless, throughout the MSP's existence the enrollees in the plan were persons thought by officials of the corporation to be members of corporate management or highly compensated individuals. (The levels of compensation for employees in the grocery and related businesses are historically lower than in other industries.)

The decision to allow persons to remain in the plan who were not qualified under newly adopted criteria[7] was prompted primarily because the officials of the company considered those persons to still be valuable members of management—they were still valuable to the company, and it would have been a devastating morale blow for them to be denied the opportunity to continue to participate in the plan. Initially, the administrative committee decided that participants in that category could continue to participate but that their level of participation would not increase as their salaries increased. However, there were so many complaints from those participants about their benefits being frozen that the administrative committee changed its mind, and allowed those who were "grandfathered" in the plan to have full participation thereafter.

In a few instances, a plan participant who was demoted to a position that if held when the employee entered the plan would have caused him or her not to be eligible for participation at the time of his or her entry, was allowed to continue to be a plan participant. Consequently, anyone who became a participant in the plan was allowed to continue as a participant, no matter what change there might have been in his or her job status (except, of course, participation terminated when employment terminated).

The administrative committee never had a formal definition of "management" to guide them in determining eligibility for participation in the MSP. Similarly, it had no standard to guide it in determining which employees would be considered "highly compensated employees," other than the standards mentioned above—all salaried personnel until 1984, and from 1984 through 1992 the salary minimums mentioned above, beginning at $25,000.00 in 1984 and going to $60,000.00 starting in

1990. Neither the administrative committee nor anyone else in a position of authority with Cullum Companies, Inc., attempted to be more selective in the choice of employees to participate in the MSP than to apply the selection criteria that have been mentioned above in this section of this Memorandum Opinion and Order.

Other than the one instance mentioned above of a change in plans relative to benefits for "grandfathered" participants, no evidence was offered to suggest that the participants in the MSP were able to influence the benefits to be provided under the MSP or any of the terms of the MSP, or tried to exercise any such influence. The court cannot find from the evidence that any participant in the MSP, with the possible exception of the few executive officers of the corporation who were participants, had the bargaining power to influence the benefits or other terms of the MSP in any respect.

With, perhaps, *de minimis* exceptions, all persons eligible to participate in the MSP were a part of the management of Cullum Companies, Inc., or one of its subsidiaries, at one management level or another. And, again with *de minimis* exceptions, and bearing in mind the salary levels expected in business operations of the kind in which Cullum Companies, Inc., and it subsidiaries were engaged, all participants in the MSP could be viewed to be "highly compensated employees."

## VI.

### Pertinent Legal Authorities

■ As previously noted, the statutory standard defendant's proof was *required* to meet at trial was that the MSP was "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 28

---

7. The written documentation indicates that the grandfathering of participants who did not qualify under newly adopted criteria applied only to participants who were in the plan as of January 1, 1987, *see* Agreed Exs. 9–14; but, in practice the grandfathering applied to all participants who did not meet new criteria, including criteria adopted after 1987.

U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1). The Fifth Circuit explained, in a different context, that statutory words must be given meaning. *See Spacek v. Maritime Ass'n,* 134 F.3d 283, 289 (5th Cir.1998). The definition of a top hat plan has been described as a narrow one. *See In re New Valley Corp.,* 89 F.3d 143, 148 (3d Cir.1996), *cert. denied,* 519 U.S. 1110, 117 S.Ct. 947, 136 L.Ed.2d 835 (1997). In applying the statutory language, the court must take into account that "ERISA is a remedial statute to be liberally construed in favor of employee benefit fund participants," and that exemptions from the ERISA coverage should be confined to their narrow purpose. *Kross v. Western Elec. Co., Inc.,* 701 F.2d 1238, 1242 (7th Cir.1983).

"[T]op hat plan participants, unlike ordinary pension plan participants, are typically high-ranking management personnel" who "are therefore better equipped than ordinary pension plan participants to effectively protect their interests in the employee benefits bargaining process." *Spacek,* 134 F.3d at 296 n. 12. "This is the very reason that Congress chose not to subject top hat plans to ERISA's vesting, accrual, participation, and fiduciary requirements." *Id.* The Department of Labor's view of the reason for, and justification of, the top hat exemption was expressed as follows:

[I]n providing relief for "top hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and therefore, would not need the substantive rights and protection of Title I [of ERISA].

*Id.* (quoting Dep't of Labor Op.Ltr. 90–14A).

The enactment by Congress of ERISA was a recognition that the employees to be aided by ERISA lacked the bargaining power to obtain nonforfeitable benefits through contractual negotiations. *See Gallione v. Flaherty,* 70 F.3d 724, 727 (2d Cir.1995). In the course of explaining how a top hat plan fits into the ERISA scheme, the Second Circuit said:

As one method of accomplishing the goal of decreasing the number of lost pensions, ERISA established certain minimum requirements that covered plans must meet, including requirements for nonforfeitability, *i.e.,* vesting. However, Congress made ERISA's vesting provisions inapplicable to any plan "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). *See also id.* § 1081(a)(3) (excepting such plans from ERISA's funding requirements); *id.* § 1101(a)(1) (excepting such plans from ERISA's fiduciary responsibility requirements). Dubbed a "top hat" plan, such a plan was excluded from ERISA's vesting, funding, and fiduciary responsibility requirements because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations.

*Id.*

A legitimate top hat plan must cover a "select group" of employees who are "only high-level employees." *In re New Valley Corp.,* 89 F.3d at 148. The mere fact that the employer intends the plan to be a reward to "key" employees does not satisfy the degree of selectivity contemplated by the statutes. *See Hollingshead v. Burford Equip. Co.,* 747 F.Supp. 1421, 1429 (M.D.Ala.1990). Rather, the statute contemplates that a top hat plan will be for the benefit of "high-ranking employees." *See Bigda v. Fischbach Corp.,* 898 F.Supp. 1004, 1015 (S.D.N.Y.1995), *aff'd,* 101 F.3d 108 (2d Cir.1996).

## VII.

### Application of the Law to the Facts of this Case

■ The decision the court has concluded it must reach in this case, that defendant has not met its burden to establish that the MSP was a top hat plan, is made difficult by the acceptance by the court of the evidence that Cullum Companies, Inc., at all times intended the MSP to be a top hat plan and operated on a good-faith belief that it so qualified. The court is satisfied that at no time did the corporation or any of its officials act with an improper motive or with any design to cheat or otherwise financially abuse its employees or to cause them to receive less than the benefits to which they were entitled under the law. And, the court is satisfied that at all times Cullum Companies, Inc., and its officials, including the members of the administrative committee, conducted themselves in relation to the MSP with the goal in mind to be fair to the participants in the administration of the plan.

Unfortunately, however, notwithstanding the good intent of Cullum Companies, Inc., and its officials, the court simply cannot find from the evidence that the MSP was maintained by Cullum Companies, Inc., and its subsidiaries "primarily ... for a select group of management or highly compensated employees."[8] The words "a select group of" must be given some meaning. Quite candidly, the court questions whether it can articulate the meaning of the words "a select group," as used in the statute. The furthest the court can go is to express the conclusion that it cannot find from the evidence that the participants of the MSP were "a select group" out of the broader group of management employees or the broader group of highly compensated employees.

Perhaps, as the Department of Labor and some of the court decisions have suggested, the "select group" test is whether the members of the group have positions with the employer of such influence that they can protect their retirement and deferred compensation expectations by direct negotiations with the employer. The evidence does not persuade the court that any significant number of the participants in the MSP individually had bargaining power of that kind. Of course, as a group, to the extent that they could act cohesively, they undoubtedly could influence the design and operation of the MSP, but that would be true of any group of employees within a company.

As sympathetic as the court is with the attempts by Cullum Companies, Inc., to be fair with its employees in the design and application of the MSP, the court cannot find from the evidence that defendant has proved by a preponderance of the evidence that the MSP was maintained for a select group of management or highly compensated employees, as those words are used in ERISA. Therefore,

## VIII.

### ORDER

The court ORDERS and DECLARES that the MSP was not "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees," as those words are used in 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1).

---

8. The court does not reach the issue of whether the MSP was maintained "primarily for the

purpose of providing deferred compensation."