*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0023p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

REBECCA A. BAKRI,

      *Plaintiff-Appellant,*

    *v.*

      No. 05-4532

VENTURE MFG. COMPANY,

      *Defendant-Appellee.*

>

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 03-00405—Thomas M. Rose, District Judge.

Argued: November 1, 2006

Decided and Filed: January 17, 2007

Before: MERRITT and BATCHELDER, Circuit Judges; HEYBURN, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** William J. O'Malley, O'MALLEY & OGLESBEE, Columbus, Ohio, for Appellant. R. Gary Winters, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellee. **ON BRIEF:** William J. O'Malley, O'MALLEY & OGLESBEE, Columbus, Ohio, for Appellant. R. Gary Winters, Ian R. Smith, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellee.

---

## OPINION

---

MERRITT, Circuit Judge. The question in this ERISA case arising from a company's deferred compensation plan is whether the District Court erred in granting summary judgment for the defendant company by holding that the plaintiff, Rebecca Bakri, a former employee, was a participant in a "top hat" deferred compensation plan as defined by 29 U.S.C. § 1051(a)(2)[1] which

---

[*] The Honorable John Heyburn II, Chief United States District Judge for the Western District of Kentucky, sitting by designation.

[1] Section 1051 of ERISA provides that the various protections for plans provided by ERISA do not apply to:

> (2) A plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees . . . .

Such plans, therefore, fall outside the "coverage" of ERISA and are generally referred to as "top hat" plans.

1

exempts such plans from the vesting or nonforfeitability requirements of § 1053. We do not believe that the plan in question qualifies as a "top hat" plan because it does not meet the "selectivity" requirements of § 1051(2). Therefore, we reverse the judgment below and remand for further proceedings.

The purpose of the "top hat" exception to ERISA coverage has been characterized by the Department of Labor as a recognition by Congress "that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiations or otherwise, the design and operation of their deferred compensation plan . . . and would, therefore, not need the substantive rights and protections of" ERISA. DOL, Office of Pension & Welfare Benefit Programs, Opinion 90-14A, 1990 WL 123933 at *1 (May 8, 1990). The Second Circuit has said that such "top hat" plans were "excluded from ERISA's vesting, funding, and fiduciary responsibility requirements because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations." *Gallione v. Flaherty*, 70 F.3d 724, 727 (2d Cir. 1995). *Accord Spacek v. Maritime Ass'n*, 134 F.3d 283, 289, 297 n.12 (5th Cir. 1998) ("Top hat" participants should be "high-ranking management personnel" who "are therefore better equipped than ordinary pension plan participants to effectively protect their interests."); *Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp. 2d 468, 477 (N.D. Tex. 1999).

In determining whether a plan qualifies as a top hat plan, we consider both qualitative and quantitative factors, including (1) the percentage of the total workforce invited to join the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative). *See Carrabba*, 38 F. Supp. 2d at 479. The *Carraba* opinion concludes that "the 'select group' test is whether the members of the group have positions with the employer of such influence that they can protect their retirement and deferred compensation expectations by direct negotiations with the employer." *Id.* at 478. The court then went on to say:

> Of course, as a group, to the extent that they could act cohesively, they undoubtedly could influence the design and operation of the NSP [the deferred compensation plan], but that would be true of any group of employees within a company.

*Id.*

In this case we must accept as true the affidavit of Rebecca Bakri filed in opposition to the summary judgment motion of the company. Ms. Bakri's affidavit claims that she was an excellent employee for 20 years who believed she was underpaid because she was a woman. When she sought a pay raise, the company president, Mr. Hollis, told her, "Women do not need to make as much as a man" and directed her to "destroy evidence relevant to [a similar ERISA] . . . case in federal court." The affidavit further alleges the following relevant facts:

> 5. When my employment ended, Venture decided to keep all of the money in my deferred compensation plan. The deferred comp plan was created in 1992. It was explained to me that the plan was being created so that long term loyal salaried employees would have a retirement plan. The hourly employees at Venture already had a separate company funded retirement plan. The terms and conditions of the deferred comp plan that I participate in were the same as the plans created for the other salaried participants, except the amount contributed by Venture was different for each employee.

> 6. Venture Mfg. Company contributed regularly to the initial deferred compensation plan and then to the subsequent deferred compensation plan. Venture contributed roughly $5,500 per year for ten years (1993 through 2002). When I was terminated,

Venture took back all of the contributions. I received nothing of the $55,000 plus interest in my deferred compensation plan.

. . . .

8. Plus, the top level executives at Venture did not participate in the plan. Russ Hollis was the President and 90% shareholder until the past couple years. Paul Hollis is Russ Hollis' son. He was the Vice President and 10% shareholder until his father transferred the stock to him. Neither participated in the salaried employees deferred compensation plan. Greg Steinhauer was my boss at the time my employment ended. (He assumed the systems management duties I had performed and then was paid nearly twice what I had been earning.) Mr. Steinhauer does not participate in the plan. Mr. Idzakovich did participate in the plan, but it is my understanding that when he was promoted to top management a couple years ago he ceased to participate in the plan and Venture stopped contributing to his plan.

. . . .

10. Looking at who was in the plan and who was not, it is clear that the deferred comp plan was made available to the long-term salaried employees who were not at the very top of management. Participation was not limited to high level management or even high level positions; it included secretarial/administrative positions and people with manager titles who supervised no one. For example, I supervised no one. Neither did Mike Green, Valera Jones, or Becky Ferguson. Ms. Jones was an administrative assistant. Ms. Ferguson was an administrative assistant in finance. Mr. Cyphers ran the tool room. We (Cyphers, Ferguson, Jones, Green, and myself) represented half of the participants in the salaried employees deferred compensation plan.

Taking into account the allegations of the affidavit quoted above and the record in the case showing that the deferred compensation plan consisted of employees like Rebecca Bakri, who had no supervisory, policy making, or executive responsibility, and had little ability to negotiate pension, pay or bonus compensation, we must conclude that the "selectivity" element of the "top hat" exception to coverage is missing in this plan. Accepting the affidavit presented by Rebecca Bakri in opposition to the company's motion for summary judgment as true for this summary judgment analysis, we reverse the District Court and remand the case for further proceedings in accordance with this opinion.

Accordingly, it is so ordered.