PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1288
_____

PAUL F. SIKORA,
                            Appellant

v.

UPMC, a Pennsylvania non-stock non-profit corporation
a/k/a UPMC Health System;
UPMC HEALTH SYSTEM AND AFFILIATES NON
QUALIFIED SUPPLEMENTAL BENEFIT PLAN
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
W.D. Pa. No. 2-12-cv-01860
District Judge: Honorable Mark R. Hornak
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 25, 2017

Before: SMITH, *Chief Judge*, McKEE, and RESTREPO,
*Circuit Judges*

(Filed: November 24, 2017)

Michael E. Hoover
Diefenderfer Hoover McKenna & Wood
310 Grant Street
Suite 1420
Pittsburgh, PA  15219
        *Counsel for Appellant*

John J. Myers
Eckert Seamans Cherin & Mellott
600 Grant Street
44th Floor, US Steel Tower
Pittsburgh, PA  15219
        *Counsel for Appellees*

————————————————

OPINION of the COURT
————————————————

SMITH, *Chief Judge.*

A so-called "top-hat" plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  29  U.S.C.  §§ 1101(a)(1),  1051(2), 1081(a)(3).  These plans need not comply with many of the substantive provisions of the Employee Retirement

2

Income Security Act of 1974 ("ERISA"). When Paul F. Sikora sought to recover pension benefits under ERISA, the District Court held that he was not entitled to obtain such relief because he sought benefits under a top-hat plan. Sikora appeals, arguing that the District Court should have required Defendants, the University of Pittsburgh Medical Center and its Health System and Affiliates Non-Qualified Supplemental Benefit Plan (collectively, "UMPC"), to prove that plan participants had bargaining power before concluding that he participated in a top-hat plan.[1] Plan participant bargaining power, though, is not a substantive element of a top-hat plan. We will therefore affirm the District Court's judgment.

I

---

[1] While Sikora's notice of appeal also references the District Court's entry of summary judgment on his contract claim, he makes no argument in support of that claim in his briefing. We therefore deem it abandoned. *See New Jersey v. Merrill Lynch & Co.*, 640 F.3d 545, 547 n.3 (3d Cir. 2011) (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("Failure to set forth an issue on appeal and present arguments in support of that issue in one's opening brief generally amounts to 'abandon[ment] and waive[r of] that issue . . . and it need not be addressed by the court of appeals.'") (alterations in original).

Sikora is a former employee of UPMC. He became the Vice President of IT Transformation & IT Infrastructure Services in 2005. Following that position change, Sikora became a participant in UPMC's Non-Qualified Supplemental Benefit Plan ("the Plan") in 2008. Sikora's participation in the Plan ended upon his voluntary termination from UPMC in 2011. Sikora applied for benefits under the Plan following his voluntary termination but was denied benefits for reasons unrelated to the current appeal.

Sikora filed suit against UPMC in the United States District Court for the Western District of Pennsylvania in December 2012. During discovery, UPMC and Sikora each filed motions for partial summary judgment. UPMC argued that the Plan was a top-hat plan, and, because three of Sikora's claims relied on ERISA provisions inapplicable to top-hat plans, those claims should be dismissed. Concluding that the Plan was a top-hat plan, the District Court granted UPMC's partial summary judgment motion and denied Sikora's motion. Following completion of discovery, UPMC filed a motion for summary judgment as to Sikora's remaining non-ERISA claim, which the District Court granted. Sikora timely appealed.

II

The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over the District Court's decision to grant summary judgment, and so we apply the same standard of review the District Court should apply. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015). We review questions of law *de novo*. *See Samaroo v. Samaroo*, 193 F.3d 185, 189 (3d Cir. 1999) ("We must review legal conclusions and questions of statutory construction de novo.").

## III

ERISA defines top-hat plans as those that are "unfunded and . . . maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1101(a)(1), 1051(2), 1081(a)(3). This Court previously described the top-hat plan derived from this statutory definition as having three elements: (1) "the plan [must] be unfunded"; (2) it must "exhibit the required purpose"; and (3) "it must also cover a 'select group' of employees." *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996). Sikora has the burden of showing that the Plan is not a top-hat plan to obtain relief under ERISA. *See Pane v. RCA Corp.*, 868 F.2d 631, 637 (3d Cir. 1989) (rejecting contention that a

plan's status as a top-hat plan is an affirmative defense and concluding that § 1101(a)(1) "does not provide for an exemption from liability under section 502(a)" but instead "merely provides the legal standard by which [a defendant's] section 502(a) liability is to be determined").[2]

Sikora does not dispute that the Plan is both unfunded and maintained by UPMC for the statutorily prescribed purpose. Sikora takes issue only with the third element of the test laid out in *In re New Valley Corp.*, which requires that the Plan "cover a 'select group' of employees." *In re New Valley Corp.*, 89 F.3d at 148. This Court has previously described this "select group" element as having "both quantitative and qualitative restrictions. In number, the plan must cover relatively few employees. In character, the plan must

---

[2] Sikora contends that UPMC waived reliance on *Pane* by assuming the burden of proving the Plan's top-hat status in its opening summary judgment brief. Because UPMC did (albeit belatedly) raise the issue before the District Court, and the District Court did not conclude the issue of burden was waived (instead providing Sikora with the opportunity to respond to UPMC's reliance on *Pane*), we too will not deem the issue waived. Even if UPMC had the burden of proving the Plan's top-hat status, it has done so for the reasons explained *infra*.

6

cover only high level employees." *Id.* Applying both the quantitative and qualitative restrictions of the "select group" element reveals that the Plan qualifies as a top-hat plan.

Turning first to the quantitative restriction, the Plan covers relatively few employees. During Sikora's participation in the Plan, approximately 0.1% of the entire UPMC workforce was a participant in the Plan. *See Pane*, 868 F.2d at 637 (holding that a plan-participant group comprising less than one-tenth of one percent of the workforce was numerically select); *see also Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 46 (1st Cir. 2008) (concluding that a plan's participants comprising only 8.7% of entire workforce was select); *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 289 (2d Cir. 2000) (stating that a plan's participants comprising 15.34% of the relevant workforce was sufficiently select). The quantitative restriction of the "select group" element is met.

As to the qualitative restriction, although the relevant statutory language only requires participants to be members of a select group of management *or* highly compensated employees, here the Plan covers high-level employees who are *both* a select group of management *and* highly compensated employees. 29 U.S.C. §§ 1101(a)(1), 1051(2), 1081(a)(3) (requiring "a select group of management *or* highly compensated employees" (emphasis added)). UPMC allowed only

7

members of management to participate in the Plan. Sikora speculates that some Plan participants may have had duties rendering them "non-management," but that assertion is without record support. Even if Sikora's assertion is true, the Plan participants were also highly compensated. During Sikora's participation in the Plan, the lowest paid Plan participant earned an annual salary of over $200,000.[3] Between 2007 and 2011, the average annual salary of Plan participants hovered around $500,000, as compared to the average annual salary of all UPMC employees, which was around $55,000. *See Alexander*, 513 F.3d at 46 (observing that plan participants earned an average income of $440,000, "more than five times the average income" of the employer's workforce and concluding that the question of whether plan participants were highly compensated was "open-and-shut" in "relative and absolute terms" and "nowhere near the gray area"); *Demery*, 216 F.3d at 289 (citing evidence that "the average salary of plan participants was more than double that of the average salary of all . . . employees" to conclude that plan participants were highly compensated). The Plan participants were indisputably select members of management, and were highly compensated employees. The qualitative restriction of the "select group" element

---

[3] In 2008, the lowest paid participant earned only $80,000, but that employee was UPMC's new CEO, who earned that amount in only one month of work.

8

is therefore satisfied. Given that both the quantitative and qualitative restrictions of the "select group" element have been satisfied, we hold that the Plan in question qualifies as a top-hat plan.

IV

Although both the quantitative and qualitative restrictions of the "select group" element have been satisfied, Sikora nonetheless argues that the Plan does not cover a "select group" because there is no evidence regarding the "bargaining power" of the Plan participants. Sikora's argument would require a district court to inquire not only into the qualitative and quantitative restrictions discussed above, but also into the presence of "bargaining power" before concluding that a particular plan is a top-hat plan. The argument is unpersuasive.

Sikora cites to no text in ERISA nor to any legislative history to support his argument. Instead, he relies on a paragraph from a 1990 Department of Labor ("DOL") opinion letter. The DOL opinion letter states in relevant part:

> It is the view of the Department that in providing relief for "top hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or

compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I.

U.S. Dep't of Labor, Pension & Welfare Benefit Programs, Opinion Letter 90-14A at 2 (May 8, 1990).

In interpreting this opinion letter, three of our sister circuits have inquired into participants' bargaining power before determining whether a particular plan qualifies as a top-hat plan. In *Bakri v. Venture Mfg. Co.*, the Sixth Circuit favorably quoted a district court opinion highlighting the importance of participants engaging in "direct negotiations with the employer." *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678-79 (6th Cir. 2007) (quoting *Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp. 2d 468, 478 (N.D. Tex. 1999)). Quoting the district court's opinion, the *Bakri* court noted that "the 'select group' test is whether the members of the group have positions with the employer of such influence that they can protect their retirement and deferred compensation expectations by direct negotiations with the employer." *Id.* Writing that the plan in question "consisted of employees . . . who had no supervisory, policy making, or executive responsibility, and had little

10

ability to negotiate pension, pay or bonus compensation" the Sixth Circuit concluded that the "select group" element had not been satisfied. *Id.* at 680.

In *Demery v. Extebank Deferred Comp. Plan (B)*, the Second Circuit similarly inquired into participants' ability to negotiate. As the Second Circuit wrote in that case:

> Plaintiffs also claim that the participants in Plan B did not have the ability to negotiate the terms of the Plan. Ability to negotiate is an important component of top hat plans . . . . We do not think plaintiffs have proffered either direct or circumstantial evidence suggesting an absence of bargaining power sufficient to raise a question of fact on this issue.

*Demery*, 216 F.3d at 289.

Finally, in *Duggan v. Hobbs*, the Ninth Circuit wrote that "the 'select group' requirement includes more than a mere statistical analysis." *Duggan v. Hobbs*, 99 F.3d 307, 312 (9th Cir. 1996). Citing to the DOL opinion letter, the *Duggan* court noted that the "Department of Labor has explained that the top-hat exception was intended to apply to employees who 'by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or

11

otherwise, the design and operation of their deferred compensation plan.'" *Id.* at 312-13 (quoting U.S. Dep't of Labor, Pension & Welfare Benefit Programs, Opinion Letter 90-14A at 2 (May 8, 1990)). After noting that the participant in the plan in question "exerted sufficient influence," the Ninth Circuit concluded that the plan "was maintained for a 'select group'" within the relevant statutory language. *Id.* at 313.

The First Circuit has expressed a different view, one which is in tension with the positions taken by the Second, Sixth, and Ninth Circuits. In *Alexander v. Brigham & Women's Physicians Org., Inc.*, that court declined "the appellant's invitation to depart from the plain language of the statute and jerry-build onto it a requirement of individual bargaining power." *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 47 (1st Cir. 2008). The First Circuit explained:

> The DOL opinion letter speaks only to Congress's rationale for enacting the top-hat provision. It does not present itself as an interpretation of the provision's requirements, nor does it make any mention of the need for or propriety of demanding that employers demonstrate their employees' ability to negotiate the terms of deferred compensation plans.

*Id.* We agree with the First Circuit's approach. On its

12

face, the opinion letter does not require that participants in a top-hat plan possess bargaining power. The opinion letter does, however, explain Congress's intent for creating top-hat plans. On that point, the opinion letter is therefore entitled to persuasive deference under *Skidmore v. Swift & Co*, 323 U.S. 134 (1944). *See Alexander*, 513 F.3d at 47 ("We have no quarrel with the letter's persuasiveness as a gloss on Congress's intentions in enacting the top-hat provision."); *see also Parker v. NutriSystem, Inc.*, 620 F.3d 274, 278 (3d Cir. 2010) (stating that, under *Skidmore*, statutory interpretations in opinion letters are given deference to the extent they persuade).

The opinion letter's explanation undermines Sikora's position. Rather than suggest that courts inquire into whether a particular participant wielded the requisite level of "bargaining power," the opinion letter observes that participants in top-hat plans were deemed by Congress to possess bargaining power "by virtue of their position or compensation level." In other words, Congress felt justified in including the top-hat plan provisions in ERISA, at least in part *because* individuals in positions such as Sikora's "have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan." In short, reading the DOL opinion letter in light of *Skidmore* does not support Sikora's position.

Although the Second, Sixth, and Ninth Circuits

13

have inquired into plan participants' bargaining power, those decisions do not clearly adopt bargaining power as an additional requirement.[4] Even assuming that those opinions did adopt bargaining power as an additional requirement, they offer no reason for doing so. Given that lack of reasoning, the plain text of ERISA's top-hat provisions, and our reading of the DOL's opinion letter, we decline to engraft a bargaining power requirement onto the elements of a top-hat plan. We conclude that plan participants' bargaining power is not a substantive element of a top-hat plan.

V

For the reasons set forth above, we will affirm the judgment of the District Court.

---

[4] The Sixth Circuit in *Bakri*, for example, did not explicitly mention bargaining power when it laid out the factors it uses to determine whether a plan qualifies as a top-hat plan. *Bakri* 473 F.3d at 678 (6th Cir. 2007) ("In determining whether a plan qualifies as a top hat plan, we consider both qualitative and quantitative factors, including (1) the percentage of the total workforce invited to join the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative).").