RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JERRY ALDRIDGE; DANIEL BETTIS; GEORGE BECKMANN; DAVID BIRON; ERNEST
BISHOP, III; E. E. BISHOP; PATRICIA BOUTREIS; BRAXTON BROOKS; ROBERT
BROWN; PERRY BROWNLEE; WILLIAM H. BRYANT; E. J. BUECHE; JAMES (JJ)
BUETTGEN; JOE BYRUM; EDNA T. CALDWELL; BELINDA CLINE (KITTS); COLLIN
COPE; PATRICK COWLEY; EDWARD F. CROFTON; TAMARA CUNNINGHAM;
LARRY DAVIS; RICHARD DEARDEN; ANNE DILLARD-MCGEOCH; MARGUERITE
DUFFY; RICK ELDRIDGE; GREGORY EQUIZI; BETTY FLANAGAN; PAUL FREEMAN;
KIMBERLY GRANT; HENRY GRAU; GENE GRUVER; RONALD HARMAN; CECILIA
HEATH; ANDREW HEPP; VERONICA HEPP; SANDRA HERRINGTON; PEG HEYMAN;
ROBERT F. HIGHTOWER; JAMES HOLLAND; JAMES HOLMAN; PFILIP G. HUNT;
KEN HUTSON; NICHOLAS IBRAHIM; ROSS JACKSON; PAUL S. JONES; ROY KEENE,
deceased; LOUIS FRANK KNIGHT; ADAM (DANNY) KOONTZ; FRED KUHLEMANN;
ROBERT LAFRENIERE; DOUGLAS LANTAU; MARCELINO R. LARGEL; ROBERT
LEBOEUF; JAMES LITCHFORD; GLEN T. LOWERY; RAY MANNING; MARVIN
MARTIN; REBECCA MARTIN; SCARLETT MAY; ROBERT MCCLENAGAN; TERESA
MCCONNELL; CHARLES L. MCGUFF; CLIFFORD MEADOWS; DONALD MEIER;
EVERETT MILLS; J. RUSSELL MOTHERSHED; CRAIG NELSON; ERIC PAUL;
MAXWELL PIET; SHERRY BIGBY PRIME; JOHN PRYOR; ED REHM; MIKE RODER;
CHARLES ROSETE; LOLA RUBLE; DAVID SCHMIDT; ANDREW SCOGGINS; JOE R.
SEAITZ; LOIS M. SKOKOS; ALAN P. SMITH; EUBIE STACEY; JOHN STEPHENS;
RONNIE TATUM; LARRY THOMPSON; BARRY TIMMONS; SHERRY TURNER;
JEFFREY VAN HORNE; JACK VAUGHN; RONALD VILORD; LEE WALLACE;
CLARICE WETMORE; FRED WHITLOCK; MARK YOUNG,

> No. 24-5603

          *Plaintiffs-Appellants*,

  *v.*

REGIONS BANK,

          *Defendant-Appellee.*

─────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:21-cv-00082—Clifton Leland Corker, District Judge.

Argued: March 20, 2025

Decided and Filed: July 17, 2025

Before: GIBBONS, LARSEN, and MURPHY, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** James A. Holifield, Jr., HOLIFIELD & JANICH, PLLC, Knoxville, Tennessee, for Appellants. John C. Neiman, Jr., MAYNARD NEXSEN PC, Birmingham, Alabama, for Appellee. **ON BRIEF:** James A. Holifield, Jr., Christina J. Haley, Kelly P. Endelman, HOLIFIELD & JANICH, PLLC, Knoxville, Tennessee, for Appellants. John C. Neiman, Jr., Braden T. Morell, William B. Wahlheim, Jr., Ashlee D. Riopka, MAYNARD NEXSEN PC, Birmingham, Alabama, for Appellee.

————————————

**OPINION**

————————————

MURPHY, Circuit Judge. The Employee Retirement Income Security Act of 1974 (ERISA) imposes many fiduciary duties on those who manage the retirement plans that employers set up for their employees. ERISA generally allows employees who participate in these plans to pursue breach-of-fiduciary-duty claims against these plan administrators. But the law exempts retirement plans designed for high-level managers from its fiduciary-duty requirements. It also directs employers to keep these so-called "top hat" plans unfunded, so participating managers risk losing their benefits to an employer's creditors if the employer becomes insolvent. This risk materialized for former managers of Ruby Tuesday, Inc., when the company filed for bankruptcy. After losing their benefits, these managers sued Regions Bank— the bank that had administered their top-hat plans. Unable to bring federal fiduciary-duty claims under ERISA, the managers instead turned to state law. They asserted that Regions had breached state-law fiduciary, trust, contract, and tort duties. Alternatively, the managers sought to obtain their lost benefits from Regions under an ERISA provision that allows them to recover only equitable (not legal) relief. These claims require us to ask both a preemption question and a remedies question under ERISA.

The preemption question considers whether the Ruby Tuesday managers may pursue state-law causes of action against Regions even though ERISA preempts all state laws that "relate to" ERISA-covered plans. 29 U.S.C. § 1144(a). Our answer is no. Congress's decision to exempt administrators of top-hat plans from ERISA's fiduciary-duty requirements shows that

participating managers must protect themselves through contract—not through 50 potentially conflicting state-law standards of conduct. And while the managers argue that they seek to enforce the contractual duties that Regions agreed to accept, they must pursue this type of contract claim through ERISA's exclusive remedial scheme, not through a state-law contract action.

The remedies question considers whether the Ruby Tuesday managers may pursue their lost monetary benefits under a provision of ERISA that allows them to seek only "equitable relief" from Regions. 29 U.S.C. § 1132(a)(3). Our answer is again no. The Supreme Court and this court have both made clear that money damages qualify as legal relief that plan participants cannot obtain under § 1132(a)(3). And although the managers argue that they seek an "equitable surcharge" from Regions, they merely request damages under another label. All told, then, our answers to these two questions lead us to affirm the district court's judgment for Regions.

## I.  Background

### A.  ERISA Top-Hat Plans

ERISA regulates "employee benefit plans," a phrase that includes retirement plans for employees. 29 U.S.C. §§ 1002(3), 1003(a). This law serves competing goals. *See Conkright v. Frommert*, 559 U.S. 506, 516–17 (2010). On the one hand, Congress sought to encourage employers to create these plans. *See id.* at 517. ERISA thus contains uniform rules to simplify the regulatory environment. *See id.* It, for example, contains a single remedial scheme and preempts conflicting state laws. 29 U.S.C. §§ 1132(a), 1144(a). On the other hand, Congress sought to ensure that employees receive promised benefits. *See Conkright*, 559 U.S. at 516. ERISA thus imposes many rules on plans. Among other things, plan fiduciaries must meet several "standards of conduct" when managing the plans. 29 U.S.C. §§ 1001(b), 1104. And the plans must meet minimum vesting and funding obligations. *See id.* §§ 1053, 1082.

Congress cared more about the first of these goals than the second for retirement plans provided to high-level executives—what have come to be called "top hat" plans. A firm's top-level managers typically have the bargaining power to "substantially influence" the "design" of their retirement plans. *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007) (quoting

Dep't of Labor, Office of Pension & Welfare Benefit Programs, Opinion 90–14A, 1990 WL 123933, at *1 (May 8, 1990)). So they can insulate themselves from poor management by adding contractual protections in the plan itself. *See id.* ERISA thus exempts top-hat plans from many of its statutory protections. *See In re IT Grp., Inc.*, 448 F.3d 661, 664 (3d Cir. 2006); *Simpson v. Mead Corp.*, 187 F. App'x 481, 483–84 (6th Cir. 2006). For example, the law's fiduciary-duty rules do not apply to "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees[.]" 29 U.S.C. § 1101(a)(1). And the law contains identically worded exemptions to its funding and vesting requirements. *Id.* §§ 1051(2), 1081(a)(3).

An employer must meet two conditions to create a top-hat plan. *See* Opinion 90–14A, 1990 WL 123933, at *2. The plan may cover only a "select group" of high-level employees. 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). And the plan must be "unfunded." *Id.* Other courts have interpreted this adjective to bar employers from setting aside money for participants (whether in "escrow, trust fund, or otherwise") or from giving them a security interest in assets. *IT Grp.*, 448 F.3d at 665, 667–69 (quoting David J. Cartano, *Taxation of Compensation & Benefits* § 20.01, at 721 (2004)). Employers must instead pay benefits out of general funds that remain subject to their creditors if they become insolvent. *See id.* at 669; *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 287 (2d Cir. 2000). Although unfunded plans come with greater risks, they also help executives by delaying taxation on their benefits until they receive them in later years when they will likely have less income (and fall in a lower tax bracket). *See IT Grp.*, 448 F.3d at 664.

Employers often try to meet ERISA's requirement that a top-hat plan be "unfunded" by putting benefits into an account colloquially known as a "rabbi trust" (which got its name because the first IRS letter about such an account concerned a congregation's attempt to set aside benefits for a rabbi). *See Bank of Am., N.A. v. Moglia*, 330 F.3d 942, 944 (7th Cir. 2003). A rabbi-trust structure provides greater protection to participants because the company itself can use the trust's assets only to pay the participants' benefits and not for general corporate purposes. *See IT Grp.*, 448 F.3d at 665; *Moglia*, 330 F.3d at 944; I.R.S., Revenue Procedure 92-64, 1992 WL 509838, at *6 (July 28, 1992). Despite this restriction on the use of the funds, rabbi trusts

can still meet ERISA's "unfunded" top-hat requirement because these assets remain available to pay the company's creditors if it becomes insolvent and because the participants have no beneficial interest in the assets. *See IT Grp.*, 448 F.3d at 665; Revenue Procedure 92-64, 1992 WL 509838, at *3, 5.

## B. Ruby Tuesday's Top-Hat Plans

Ruby Tuesday, Inc., operates a chain of casual-dining restaurants. In the 1980s, this company (or its predecessor) created two top-hat plans for qualifying executives or managers: the Executive Supplemental Pension Plan and the Management Retirement Plan. We will refer to these top-hat plans jointly as the "Plans" because their differences do not matter on appeal.

In 1992, Ruby Tuesday entered a rabbi-trust agreement with Regions Bank to help it satisfy "its obligations under" the Plans. Trust Agreement, R.19-3, PageID 455. (Technically, their predecessors signed this agreement, but those corporate distinctions also do not matter on appeal.) Under the agreement, Ruby Tuesday established a trust fund that Regions would oversee as the trustee. The trust agreement "incorporated" the terms of the Plans. *Id.* It directed Regions to treat the money contributed to the trust fund "as general assets of" Ruby Tuesday and clarified that this money "remain[ed] subject to the claims of [Ruby Tuesday's] general creditors." *Id.*, PageID 465. The agreement also noted that the plan participants would not "have a preferred claim on or any beneficial ownership" interest in the fund's assets until the participants had the actual right to receive payments under the plan terms. *Id.* For the most part, the agreement instructed Regions to undertake the day-to-day administration of the Plans by paying benefits as they came due.

According to the complaint, Regions breached the trust agreement several times before Ruby Tuesday terminated the Plans and deprived participants of benefits. These breaches allegedly began in 2017 when NRD Capital bought Ruby Tuesday. The complaint suggests that this deal led to a "change in control" under the trust agreement. If so, that change would have triggered many duties. Of most note, Ruby Tuesday would have had to fund the Plans to the present actuarial value of all unpaid benefits. Yet Ruby Tuesday did not make these payments.

And Regions also did not try to compel the company to meet this requirement, as the trust agreement allegedly obliged it to do.

Next, Ruby Tuesday's board of directors allegedly terminated the Plans in March 2019 and permitted participants to take lump-sum payouts between March 2020 and March 2021. But Regions failed to inform participants of this right to a payout.

Ruby Tuesday also orally instructed Regions in July 2020 to cease all benefit payments starting the next month. Regions complied with this command. Yet the trust agreement barred Regions from stopping payments unless Ruby Tuesday said in *writing* that it had become insolvent. This written notice did not come until later—on September 2. In that notice, Ruby Tuesday alerted Regions to its insolvency, ordered Regions to cease payments, and told it to "hold the assets of the Trust for the benefit of [Ruby Tuesday's] creditors." Letter, R. 61-30, PageID 1758. According to the complaint, Regions breached the trust agreement by failing to pay benefits in August and September based on the oral order alone (not on the letter). Regions itself recognized this problem. In September, it filed an interpleader action asking a district court to decide who had the right to the funds it would have paid in August and September.

The next month, Ruby Tuesday filed a Chapter 11 bankruptcy petition. Over the objections of the participants in the Plans, the bankruptcy court ordered Regions to transfer the money in the trust fund to the bankruptcy estate for the benefit of Ruby Tuesday's creditors. After making this transfer, Regions dismissed its interpleader action. The participants then settled with Ruby Tuesday's bankruptcy estate and received their fees and a share of the fund assets. In return, the participants waived their right to appeal the bankruptcy court's orders directing Regions to pay the trust funds into the bankruptcy estate.

Many of these plan participants (whom we will call the "Participants" from here on) then sued Regions. They alleged an ERISA claim for "equitable relief" under 29 U.S.C. § 1132(a)(3). In this sole federal claim, they asserted the right to an "equitable surcharge" of the benefits that Regions would have paid if it had not breached the trust agreement. The Participants also alleged state-law claims against Regions for breach of fiduciary duty, breach of trust, breach of contract, and negligence.

The district court rejected the Participants' claims across two decisions.  The court first dismissed the state-law claims at the pleading stage on the ground that ERISA preempted them. *Aldridge v. Regions Bank*, 2021 WL 4718489, at *5–7 (E.D. Tenn. Oct. 8, 2021).  It next granted summary judgment to Regions on the ERISA claim.  It reasoned that the request for lost benefits did not qualify as the type of "equitable relief" that the Participants may seek under 29 U.S.C. § 1132(a)(3). *Aldridge v. Regions Bank*, 2024 WL 2819523, at *4–5 (E.D. Tenn. June 3, 2024).

The Participants appeal both opinions.  They argue that ERISA should not preempt their state-law claims because such preemption might deprive them of a remedy.  And if ERISA does preempt these claims, they add, it at least allows them to seek an equitable surcharge under § 1132(a)(3).  We review the district court's motion-to-dismiss and summary-judgment decisions de novo. *See Standard Ins. Co. v. Guy*, 115 F.4th 518, 521 (6th Cir. 2024); *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp*., 399 F.3d 692, 697 (6th Cir. 2005) (*PONI*).

## II.  ERISA Preemption

The Participants first challenge the district court's preemption holding.  ERISA implements Congress's uniformity goals primarily through two provisions.  The law first includes a "broad" preemption provision—29 U.S.C. § 1144(a)—that displaces the 50 state laws that might otherwise regulate covered employee benefit plans. *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 98 (1983).  It next includes an "integrated enforcement mechanism"—29 U.S.C. § 1132(a)—that lists the exclusive ways that parties may sue for violations of the law or a covered plan. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).  These two sections have led federal courts to divide ERISA preemption into two categories: complete preemption (a doctrine rooted in the law's purposes) and express preemption (a doctrine rooted in the law's text). *See K.B. ex rel. Qassis v. Methodist Healthcare - Memphis Hosps*., 929 F.3d 795, 800 (6th Cir. 2019).

### A.  Complete Preemption

ERISA qualifies as one of the few laws that triggers the Supreme Court's unique "complete preemption" doctrine. *See Davila*, 542 U.S. at 208–09; *Metro. Life Ins. v. Taylor*, 481

U.S. 58, 65–66 (1987). This doctrine tells courts to treat state-law claims seeking benefits from an ERISA-covered plan as federal claims under the ERISA cause of action designed for that purpose: 29 U.S.C. § 1132(a)(1)(B). *See K.B.*, 929 F.3d at 800–01. The doctrine thus allows a defendant to remove a case from a state court to a federal district court based on that court's federal-question jurisdiction even if the complaint raises only state-law claims. *See id.* By doing so, it departs from the usual "well-pleaded complaint rule" governing federal-question jurisdiction. *See Davila*, 542 U.S. at 207. That rule typically allows a defendant to remove a case only if the complaint raises federal claims on its face (not if state-law claims trigger a federal preemption defense). *See id.*

Regions suggests that the complete-preemption doctrine applies to the Participants' state-law claims. For three reasons, though, we decline to resolve this issue. Reason One: Despite its inapt name, the complete-preemption doctrine matters more to a district court's *jurisdiction* than to a defendant's *preemption* defense. *See Hogan v. Jacobson*, 823 F.3d 872, 879 (6th Cir. 2016). Yet the district court here had federal-question jurisdiction over the Participants' separate ERISA claim. *See* 28 U.S.C. § 1331. And this fact gave the court supplemental jurisdiction over their state-law claims. *See id.* § 1367(a). This case thus raises no jurisdictional issues.

Reason Two: If a court finds that ERISA completely preempts state-law claims, it should dismiss the claims only if they do not assert cognizable *federal* claims under § 1132(a)(1)(B). *See Hogan*, 823 F.3d at 883–85; *Loffredo v. Daimler AG*, 500 F. App'x 491, 500–01 (6th Cir. 2012) (Moore, J., for majority). But the Participants do not argue that they could have turned their state-law claims into ERISA claims. They have thus forfeited this argument. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022). So a finding that ERISA completely preempted the claims would lead to the same result as a finding that the law expressly preempted them: dismissal. *Cf. Lowe v. Lincoln Nat'l Life Ins.*, 821 F. App'x 489, 492 (6th Cir. 2020).

Reason Three: The separate "express preemption" doctrine that rests on § 1144(a)'s text applies more "broadly" than complete preemption. *K.B.*, 929 F.3d at 800. So if a state-law claim is completely preempted, it will also be expressly preempted. But the opposite is not always true. *See id.* at 800, 803. Basic judicial-economy concerns thus favor jumping to the

broader express-preemption doctrine without first considering the "narrow" complete-preemption issue. *Id.* at 803.

## B. Express Preemption

We thus turn to express preemption: Do the Participants' state-law claims fall within the text of 29 U.S.C. § 1144(a)?  This text states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. This preemption language is "conspicuous for its breadth." *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990).  Since 1983, the Supreme Court has defined the phrasal verb "relate to" broadly to cover any state law that has "a connection with or reference to" an ERISA plan.  *Shaw*, 463 U.S. at 97.  And ERISA defines "State law" broadly to cover "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State."  29 U.S.C. § 1144(c)(1).

But just how much state law does the preemption provision swallow up?  That question has plagued the Supreme Court for decades.  *See Standard Ins.*, 115 F.4th at 522.  The Court at first suggested that it would read the phrase "relate to" literally to have its "broad common-sense meaning[.]"  *Metro. Life Ins. v. Massachusetts*, 471 U.S. 724, 739 (1985).  But it soon departed from this reading once it recognized that "relations stop nowhere" and that an "uncritical literalism" could preempt all state law.  *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56 (1995) (citation omitted).  Since then, the Court has tried to develop "workable standards" to guide ERISA preemption.  *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016).

### 1. Express-Preemption Standards

Today, the Court evaluates express-preemption questions using the two parts from *Shaw*'s original definition of the phrase "relate to."  ERISA can preempt a state law either if the law makes "reference to" an ERISA plan or if the law has a "connection with" such a plan. *Shaw*, 463 U.S. at 97; *see Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020); *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324 (1997).  The Court follows different rules for each part of this test.  *See Rutledge*, 592 U.S. at 86, 88.

*"Reference To" a Plan*.  The Court has given the phrase "reference to" a clear (if narrow) scope.  A state law can "refer to" an ERISA plan in two situations.  A reference exists if a state law "acts immediately and exclusively upon" an ERISA plan.  *Dillingham*, 519 U.S. at 325.  For example, a Georgia garnishment law met this test because it *specifically* exempted ERISA plans. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 829–30 (1988); *see also District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130–31 (1992).  But a California prevailing-wage law did not meet the test because it applied *generally* to all "apprenticeship programs," only a subset of which were ERISA plans.  *Dillingham*, 519 U.S. at 325.

Next, a prohibited reference exists if a state law depends on the "existence" of an ERISA plan for its "operation" in practice.  *Id*. at 325.  So a Texas common-law rule met this test by barring employers from firing employees "to avoid contributing to, or paying benefits under," an ERISA plan.  *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990).  This wrongful-discharge claim referred to an ERISA plan because the plan's "existence" qualified as an element of the claim.  *Id.*  Conversely, an Arkansas law regulating the amounts that pharmacy benefits managers must pay pharmacies under prescription-drug plans did not meet this test because the law covered many plans (not just ERISA plans).  *See Rutledge*, 592 U.S. at 88–89.

*"Connection With" a Plan*.  The Court has given the phrase "connection with" a more amorphous (if broader) scope.  It has said that this synonym for the phrase "relates to" offers "no more help" as a linguistic matter.  *Travelers*, 514 U.S. at 656.  To decide whether a preemptive connection exists, the Court instead examines ERISA's "objectives," *id.*, and the "nature" of a state law's "effect" on a covered plan, *Dillingham*, 519 U.S. at 325.

Under this purpose and effects approach, the Court typically finds that a preemptive "connection" exists when state laws touch matters that ERISA already covers.  Of most relevance, the Court has held that plan participants may not seek benefits under an ERISA-covered plan using state-law contract and tort claims.  *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47–57 (1987).  The Court reasoned that Congress established a "comprehensive civil enforcement scheme" in 29 U.S.C. § 1132(a).  *Id.* at 54.  Yet plan participants would upend Congress's careful "choice of remedies" in § 1132(a) if they could pursue *other* state-law

remedies that Congress excluded from that subsection.  *Id.*  As a result, state laws that offer "alternative enforcement mechanisms" to those in § 1132(a) have the preemptive connection to ERISA plans.  *Travelers*, 514 U.S. at 658; *see Smith v. Provident Bank*, 170 F.3d 609, 613–15 (6th Cir. 1999).

The Court has applied the same logic to many other ERISA-covered topics.  Take ERISA's reporting requirements.  Plan administrators must "keep detailed records" and provide an annual report to the Secretary of Labor about the plan.  *Gobeille*, 577 U.S. at 321–22.  Apart from ERISA, many state laws require payers of health-care services (including ERISA plans) to disclose to state agencies their health-care payments for inclusion in a public database.  *See id.* at 315–16.  The Court found one such Vermont law preempted as applied to ERISA plans.  *Id.* at 321–26.  It held that the law had a preemptive connection to ERISA plans both because ERISA's reporting requirements were "a central matter of plan administration" and because additional state reporting duties could impose "wasteful administrative costs" that would undermine ERISA's uniformity goals.  *Id.* at 323 (quoting *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001)).

Or take beneficiary designations.  ERISA requires administrators to pay the individuals that participants specifically identify as beneficiaries or those the plan identifies when participants fail to designate anyone.  *See Egelhoff*, 532 U.S. at 147–48.  Yet some state laws set different rules.  *See id.* at 144, 146.  A Washington law, for example, revoked a participant's spouse as a beneficiary for nonprobate assets (including an ERISA plan's benefits) upon their divorce.  *See id.* at 144.  The Court held that this law had a preemptive connection to ERISA plans because, like reporting requirements, benefits payments concerned a "central matter of plan administration."  *Id.* at 148.  And it would undercut ERISA's uniformity goals to require plans to keep track of all state laws governing these designations.  *Id.* at 147–50; *see Boggs v. Boggs*, 520 U.S. 833, 841 (1997).

Lastly, take the content of plans.  ERISA seeks to ensure that employers uphold their promises, but it does not compel them to offer any specific "substantive benefits."  *Gobeille*, 577 U.S. at 320.  So state laws had a preemptive connection to ERISA plans when they required those plans (among others) to adopt certain benefit structures.  For instance, ERISA preempted

state laws that barred ERISA plans from reducing a participant's benefits based on amounts that the participant recovered in a tort suit. *See FMC*, 498 U.S. at 59–60; *see also Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523–25 (1981). And it preempted state laws that compelled plans to pay specific benefits. *See Shaw*, 463 U.S. at 96–100; *see also Metro. Life*, 471 U.S. at 739.

So which "connections" fall short then? ERISA does not preempt state laws just because they have an *economic effect* on ERISA plans. *See Rutledge*, 592 U.S. at 88. ERISA thus did not preempt a tax on health-care facilities as applied to facilities operated by ERISA plans even though this tax increased the costs of the plans. *De Buono v. NYSA-ILA Med. And Clinical Servs. Fund*, 520 U.S. 806, 816 (1997). And ERISA did not preempt a state law that required hospitals to charge certain customers higher prices even though this law again increased the costs of ERISA plans. *See Travelers*, 514 U.S. at 659–62; *see also Rutledge*, 592 U.S. at 88.

Similarly, ERISA does not have a preemptive connection to generally applicable state laws that regulate things far afield of ERISA plans. In *Mackey*, for example, the Supreme Court held that ERISA did not preempt Georgia's general garnishment laws as applied to the garnishment of a debtor's ERISA benefits. *See Mackey*, 486 U.S. at 830–38. The Court reasoned by analogy. It first noted that ERISA plans often contract with others (say, the owner of building space) and that ERISA would not preempt a contract claim that these contractors might bring against the plans (say, for "unpaid rent"). *Id.* at 833. Yet ERISA contains no "enforcement mechanism" for such suits, so preemption might leave a victorious plaintiff without a way to collect from a plan. *Id.* at 833–34. And the Court saw no distinction between the garnishment of a plan's general assets and the garnishment of individual benefits based on the participant's debts. *Id.* at 835–36.

Following *Mackey*'s lead, we have allowed an employer to bring a breach-of-contract claim against a company that provided the employer with recordkeeping services for its ERISA-covered plan. *See PONI*, 399 F.3d at 700–03. We reasoned that the employer sought to enforce a contract between it and the recordkeeper independent of the plan and that the employer did not allege the breach of any plan provision. *See id.* at 700–01. The recordkeeper also owed no fiduciary duties to the plan or to plan participants. *See id.* at 700. We thus viewed the suit

against this recordkeeper as analogous to an ERISA administrator's suit against a law firm that provided "legal services" to the administrator. *Id*. at 701. These types of service-provider claims do not have the preemptive connection to an ERISA plan. *Id.*; *see also Kloots v. Am. Express Tax & Bus. Servs., Inc.*, 233 F. App'x 485, 488–89 (6th Cir. 2007); *Smith*, 170 F.3d at 617.

## 2. The Participants' State-Law Claims

Before applying this preemption law here, we begin with two issues that the Participants have not raised. To start, the Participants do not dispute that Ruby Tuesday's Plans meet the requirements for top-hat plans. In other words, the Plans were "unfunded" and applied to only a "select group" of top-level employees. 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

Next, the Participants do not dispute that each Plan qualifies as an "employee benefit plan" subject to ERISA's preemption provision. 29 U.S.C. § 1144(a); *see id.* §§ 1002(2)–(3), 1003(a). To be sure, the Supreme Court has suggested that "[b]enefits paid out of an employer's general assets" (as compared to a "separate fund" reserved for benefits) do not qualify as an "employee benefit plan." *Dillingham*, 519 U.S. at 326; *see Massachusetts v. Morash*, 490 U.S. 107, 114–17 (1989). And top-hat plans must be "unfunded"—that is, these plans must pay benefits out of an employer's "general assets." 29 U.S.C. § 1101(a)(1); *IT Grp.*, 448 F.3d at 669. At the same time, we and other circuit courts unanimously hold that top-hat plans are "employee benefit plans" subject to ERISA. We have reasoned that although ERISA exempts top-hat plans from specific protections (such as its fiduciary-duty rules), *see* 29 U.S.C. § 1101(a)(1), the plans trigger other "administrative and enforcement provisions" in the law, *IT Grp.*, 448 F.3d at 664; *see Loffredo*, 500 F. App'x at 500–02 (Moore, J., for majority); *Simpson*, 187 F. App'x at 484; *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 467 n.10 (6th Cir. 2002); *see also Cogan v. Phoenix Life Ins.*, 310 F.3d 238, 242 (1st Cir. 2002); *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 108 (2d Cir. 2008); *Reliable Home Health Care, Inc. v. Union Cent. Ins.*, 295 F.3d 505, 515 (5th Cir. 2002). We need not reconcile the seeming tension in this caselaw—that a top-hat plan can qualify as an employee benefit plan even though the former should be "unfunded" and the latter should be paid through a "separate fund"—because the Participants concede that the Plans qualify as employee benefit plans. *Dillingham*, 519 U.S. at 326; 29 U.S.C. § 1101(a)(1).

With these two points behind us, we proceed to the preemption analysis. The Participants asserted four causes of action against Regions under Alabama law. They first alleged that Regions breached the fiduciary duties that it owed to the Participants as the trustee of the rabbi trust that Ruby Tuesday created to administer the Plans. They next alleged that Regions committed a breach of trust by violating the duties it owed to the Participants as this trustee. They then alleged that Regions breached the trust agreement itself. They lastly alleged that Regions committed negligence by violating its duty to act with reasonable care in administering the trust.

Applying the Supreme Court's preemption test to these four state-law claims, we need not decide whether the claims make "reference to" the Plans because they have the required "connection with" them. *Shaw*, 463 U.S. at 97. That is true for both procedural and substantive reasons. Procedurally, no matter the "label" the Participants place on their four causes of action, their claims all seek the same thing: the benefits allegedly due them under their ERISA-covered Plans. *Smith*, 170 F.3d at 615 (citation omitted). Yet ERISA already contains a similar cause of action. It allows "a participant" to bring a "civil action" "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). And we would "undermine[]" Congress's "policy choices" to include only "certain remedies" in § 1132(a) if we allowed participants to pursue benefits not just through § 1132(a) but also through "alternative enforcement mechanisms" in state law. *Pilot Life*, 481 U.S. at 54; *Travelers*, 514 U.S. at 658.

Substantively, the Participants seek to impose additional duties on Regions on top of the duties that ERISA imposes. The Participants argue that Regions took on the status of a "common law fiduciary of the Plans" when it became the trustee of the rabbi trust and thus that Regions owed fiduciary, trustee, contractual, and tort "duties" of care to them. Compl., R.19, PageID 376–79. Yet ERISA already requires those who administer ERISA plans to follow its own federal duties. It, for example, requires ERISA fiduciaries to administer a plan "with the care, skill, prudence, and diligence" that a "prudent man" would exercise. 29 U.S.C. § 1104(a)(1)(B). These federally imposed duties of care are just as "central" to "plan administration" as ERISA's reporting requirements or its beneficiary designations.

*Gobeille*, 577 U.S. at 323 (quoting *Egelhoff*, 532 U.S. at 148). And we would undercut ERISA's uniformity goals in the same way if we subjected plan administrators not just to ERISA's fiduciary duties but also to the potentially conflicting standards of conduct of all 50 States. *See id.*; *Smith*, 170 F.3d at 613.

Admittedly, this case comes with a wrinkle: ERISA exempts administrators of top-hat plans from its federal fiduciary duties. *See* 29 U.S.C. § 1101(a)(1). But that fact does not change things. The statutory regime shows that Congress "deliberately omitted" these duties because high-level employees can protect themselves through contract. *Pilot Life*, 481 U.S. at 54 (citation omitted); *see Bakri*, 473 F.3d at 678. Yet courts would eviscerate this legislative decision to allow for "less-intrusive regulation of top-hat plans" if they substituted "a *more-*intrusive system" of state regulation. *Loffredo*, 500 F. App'x at 495 (Sutton, J., opinion). The preemption provision thus continues to apply to these plans even though ERISA exempts them from many rules. *See Paneccasio*, 532 F.3d at 113; *Cogan*, 310 F.3d at 242. And the Participants "may not use state law to put back in what Congress has taken out." *Loffredo*, 500 F. App'x at 496 (Sutton, J., opinion).

An analogy to ERISA's requirements for plan benefits confirms this point. Congress chose not to compel any "substantive benefits" in ERISA plans. *Gobeille*, 577 U.S. at 320. It instead gives employers substantial freedom to decide on the benefits to provide. *See id.* at 320–21. Yet the Supreme Court has not read this congressional choice as a license to allow States to impose all sorts of benefit mandates. Rather, it has found that ERISA preempts those state mandates because they interfere with the freedom that ERISA gives employers. *See Rutledge*, 592 U.S. at 86–87; *see also Metro. Life*, 471 U.S. at 739; *Shaw*, 463 U.S. at 96–100. Identical logic covers Congress's decision to exclude the administrators of top-hat plans from ERISA's fiduciary duties.

Nothing that the Participants say convinces us otherwise. They first argue that ERISA cannot preempt state-law fiduciary rules of conduct for top-hat administrators because it does not impose any federal fiduciary-duty rules on those administrators. They then add that ERISA cannot preempt state-law causes of action to enforce these state-law rules of conduct because where there is a "right," there must be a "remedy." Appellant's Br. 18 (quoting *Marbury v.*

*Madison*, 5 U.S. 137, 163 (1803)). But this syllogism starts from a mistaken premise. ERISA does not just preempt the state-law *remedy* (a breach-of-fiduciary-duty cause of action). It also preempts the alleged *right* to state-law rules of fiduciary conduct. *Smith*, 170 F.3d at 613. ERISA instead establishes uniform standards to govern the conduct of those who manage covered plans. *See id.* And that fact remains true even for the top-hat plans that ERISA exempts from its fiduciary-duty rules. *See Loffredo*, 500 F. App'x at 495–96 (Sutton, J., opinion). Congress contemplated that ERISA's fiduciary duties would be replaced by the contractual duties set forth in these plans—not by the fiduciary-duty rules from all 50 States. *See Bakri*, 473 F.3d at 678.

The Participants respond that their lawsuit seeks to enforce not just (preempted) *state-law* fiduciary duties but also (non-preempted) *contractual* fiduciary duties that Regions agreed to accept when administering the Plans. But the Participants mistakenly seek to enforce these alleged contractual duties through an "alternative enforcement" vehicle (a state-law breach-of-contract suit) rather than the vehicle that ERISA provides: a suit to enforce the terms of a plan under § 1132(a)(1)(B). *Travelers*, 514 U.S. at 658. Given the Participants' litigation strategy, we need not decide whether top-hat participants may require plan administrators to follow contractually imposed fiduciary duties and enforce those contractual duties under § 1132(a)(1)(B). We decide only that if these participants seek to take this approach, they must enforce the contractual duties under ERISA's "exclusive" remedial scheme. *Pilot Life*, 481 U.S. at 54.

The Participants next say that they could not sue under § 1132(a)(1)(B) here because the purported contractual duties that Regions owes them arise from the *rabbi-trust agreement*—not from the *terms of the Plans*. Under the Participants' view, they are third-party beneficiaries who may enforce this distinct trust agreement between Ruby Tuesday and Regions. Yet we must look through the "label" of the Participants' state-law claim and consider its substance: a claim against a plan administrator for plan benefits based on its alleged misconduct. *Hogan*, 823 F.3d at 880 (citation omitted); *see Smith*, 170 F.3d at 615. If ERISA did not preempt this state-law claim, all plan beneficiaries (including those participating in ordinary plans subject to ERISA's fiduciary duties) could seek benefits from plan administrators by bringing state-law suits to

enforce the contracts that those administrators entered with the plan-sponsor employers. Such suits would add a glaring exception to ERISA's "uniform system of plan administration" by allowing beneficiaries to seek benefits outside ERISA's exclusive remedies. *Gobeille*, 577 U.S. at 323. Our caselaw prevents this result because it treats a breach-of-contract suit as having a preemptive connection to a plan whenever it implicates the "relations among the traditional ERISA plan entities" (plan beneficiaries, sponsors, and administrators). *PONI*, 399 F.3d at 700 (citation omitted). The Participants' claims against Regions implicate these relations.

That logic also shows why the Participants get nowhere with their analogy to our service-provider cases. Recall that ERISA does not preempt state-law claims that employers bring against the *nonfiduciary* service providers that help them operate their plans. *See id.* at 699. When the plans (or their employer sponsors) act like "any other commercial entity"—say, by leasing business space or obtaining a telephone plan for employees—any distinct contracts between these parties fall within the domain of state contract law rather than ERISA. *Id.* at 700 (citation omitted); *see Mackey*, 486 U.S. at 833. ERISA says nothing about a plan administrator's contract with Verizon even if that phone service helps it operate the plan. But this reasoning does not apply here because all agree that Regions would have had fiduciary duties under ERISA if it had managed ordinary plans rather than top-hat plans. That fact explains why the Participants seek to impose state-law fiduciary duties on the bank. Since Regions qualifies as "a traditional ERISA plan entity," though, the Participants may bring their claims against the bank only under ERISA's regime. *PONI*, 399 F.3d at 700.

Finally, the Participants direct us to the IRS's model rabbi-trust agreement. *See* Revenue Procedure 92-64, 1992 WL 509838. The model agreement says that it "shall be governed by and construed in accordance with the laws of" a specific State. *Id*. at *9. The Participants argue that this model term shows that ERISA does not preempt their attempts to enforce the rabbi-trust agreement under Alabama law. We disagree. Perhaps state law could govern a contract dispute between a plan-sponsor employer and the trustee of a rabbi trust. But we need not decide that question. We hold only that plan beneficiaries may not avoid ERISA's "exclusive" provisions for seeking plan benefits by pursuing those benefits through a state-law contract claim as third-party beneficiaries of a rabbi-trust agreement. *Pilot Life*, 481 U.S. at 54.

### III.  ERISA's "Equitable" Remedies

The Participants thus fall back on one of ERISA's specific enforcement provisions. They challenge the district court's conclusion that they may not obtain their benefits under a provision that allows them to pursue "equitable relief" against Regions.  29 U.S.C. § 1132(a)(3). This claim falls short because the district court correctly recognized that the Participants seek legal relief.

### A.  The Meaning of "Equitable Relief" in § 1132(a)(3)

ERISA contains several "carefully crafted" causes of action in § 1132(a) that distinguish between the plaintiffs who may sue, the conduct that they may challenge, and the remedies that they may seek.  *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 254 (1993).  Some paragraphs in § 1132(a) allow participants or beneficiaries to sue, *see* 29 U.S.C. § 1132(a)(1), while others allow the Secretary of Labor to sue, *see id.* § 1132(a)(5).  Some permit suits only against those who qualify as ERISA fiduciaries, *see id.* § 1132(a)(2), while others permit suits against additional actors, *see id.* § 1132(a)(3); *see also Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000); *Mertens*, 508 U.S. at 253.  Some permit suits over violations of ERISA-covered plans, *see* 29 U.S.C. § 1132(a)(1)(B), while others permit suits over violations of ERISA itself, *see id.* § 1132(a)(4).  And some permit many remedies (such as money damages), *see* 29 U.S.C. § 1132(a)(2), while others permit limited remedies (such as equitable relief), *see id.* § 1132(a)(5); *see also Varity Corp. v. Howe*, 516 U.S. 489, 509–10 (1996).

This case concerns § 1132(a)(3)—what the Supreme Court has described as a "catchall" cause of action.  *Varity*, 516 U.S. at 511.  Section 1132(a)(3) permits a "participant, beneficiary, or fiduciary" to bring a lawsuit "to enjoin any act or practice which violates [ERISA] or the terms of the plan" or "to obtain other *appropriate equitable relief* (i) to redress such violations or (ii) to enforce [ERISA] or the terms of the plan[.]"  29 U.S.C. § 1132(a)(3) (emphasis added). The Participants claim that their request for benefits in this suit qualifies as "equitable relief" that they may seek under this cause of action.  We thus must consider the meaning of that phrase.

The word equitable is a "legal term of art," so we presume that it comes with its technical legal meaning.  *Ken Lick Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 129 F.4th 370, 377

(6th Cir. 2025) (citation omitted); *see* Samuel L. Bray, *The Supreme Court and the New Equity*, 68 Vand. L. Rev. 997, 1013–14 (2015). It recalls the time in our history when governments divided their benches into distinct courts of equity and courts of law. *See Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 497 (4th Cir. 2023) (citing Bray, *supra*, 68 Vand. L. Rev. at 998–99). These two courts could provide different types of remedies. *See id.* As "the classic form of *legal* relief," the law courts would grant compensatory damages. *Mertens*, 508 U.S. at 255. And as the classic form of *equitable* relief, the equity courts would grant injunctions. *Rose*, 80 F.4th at 498.

So which remedies fall within the phrase "equitable relief" in § 1132(a)(3)? When assessed against our history, that phrase could convey a broad idea or a narrow one. *See Mertens*, 508 U.S. at 255–59. Broadly, Congress might have used the phrase to include *any* remedy that equity courts could grant in the "particular case at issue." *Id.* at 256. This view would have important implications for ERISA because the Supreme Court has long relied on the common law of trusts to interpret the law. *See Harris Tr.*, 530 U.S. at 250. Equity courts had exclusive jurisdiction over these trust cases, so beneficiaries could turn to the law courts only in narrow situations. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 439–40 (2011); *Mertens*, 508 U.S. at 255–56 & n.6; *In re James' Estate*, 19 N.Y.S.2d 532, 534–35 (Surrogate's Ct. 1940). And when the equity courts had exclusive jurisdiction (as in trust cases), they could grant far more remedies than in cases over which they had concurrent jurisdiction with the law courts. *See Rose*, 80 F.4th at 498. Equity courts could, for example, issue money awards to beneficiaries for losses caused by a fiduciary-duty breach. *See Mertens*, 508 U.S. at 256. Thus, if the phrase "equitable relief" includes all remedies that equity courts could grant in trust cases, § 1132(a)(3) would essentially permit awards of money damages. *See id.* at 255–57; John H. Langbein, *What ERISA Means By "Equitable*,*"* 103 Colum. L. Rev. 1317, 1336–38, 1352–53 (2003).

Narrowly, Congress might have used the phrase "equitable relief" to cover only those remedies that would have been "traditionally viewed as 'equitable'" (rather than legal) at the time of ERISA's enactment. *Mertens*, 508 U.S. at 255. Under this view, even if an equity court could grant what most lawyers would call legal relief in special cases, that relief would still not qualify as "equitable" under § 1132(a)(3). Instead, courts would decide *as a general matter*

whether a given remedy qualified as legal or equitable regardless of the cause of action at issue. *See id.* at 256. And, as the Fourth Circuit has explained, the distinct remedies that the equity and law courts could issue when they had *concurrent* jurisdiction provides a good benchmark for the types of remedies that most lawyers would call equitable or legal. *See Rose*, 80 F.4th at 500, 502. Consider ordinary breach-of-contract cases. *See id.* at 497; Samuel L. Bray, *Equity, Law, and the Seventh Amendment*, 100 Tex. L. Rev. 467, 470, 488 (2022). The equity courts might grant specific performance to a plaintiff, but the plaintiff would have to turn to the law courts for damages. *See Rose*, 80 F.4th at 497. If "equitable relief" in § 1132(a)(3) comes with this narrower meaning, then, courts should divide all the types of relief—damages, injunctions, restitution, mandamus, accounting of profits, and the like—into equity and legal camps. And ERISA plaintiffs who sue under § 1132(a)(3) could seek only the remedies that fall within the equity camp.

Thankfully, we need not independently choose between these broad and narrow readings. For decades, the Supreme Court has held that Congress chose the narrower view of "equitable relief" in § 1132(a)(3). *See Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142, 147–48 (2016); *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 94 (2013); *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361 (2006); *Great-West Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 210, 219 (2002); *Mertens*, 508 U.S. at 255–59. The Court has explained that the phrase includes only those remedies "that were *typically* available in equity," not all remedies that equity courts could provide in, say, trust cases. *Mertens*, 508 U.S. at 256. The broader interpretation would effectively read out the word "equitable" from the statute because equity courts in trust cases could grant any conceivable remedy. *See id.* at 257. And the Court noted that "'[e]quitable' relief must mean *something* less than *all* relief." *Id*. at 258 n.8.

When might a claim for money (like the Participants' request for their benefits) qualify as an "equitable" remedy? It depends. *See Rose*, 80 F.4th at 498. Of most note, the Supreme Court in *Mertens* concluded that a request for "compensatory *damages*"—that is, a request for "monetary relief" measured by the plaintiff's "losses"—falls on the nonactionable legal side of the divide. 508 U.S. at 255. *Mertens* thus held that plan beneficiaries could not sue under

§ 1132(a)(3) to recover their monetary losses from a nonfiduciary who knowingly participated in an administrator's breach of fiduciary duties. *See id.* at 255–56.

The Court, by contrast, has adopted nuanced rules when a party requests money under the "restitution" name. Often, a plan administrator who invokes a subrogation clause in a plan will ask beneficiaries to turn over money that they recover from third-party tortfeasors to reimburse the plan for expenses paid on the beneficiaries' behalf. *See Montanile*, 577 U.S. at 139–40; *McCutchen*, 569 U.S. at 92–93; *Sereboff*, 547 U.S. at 359–60; *Knudson*, 534 U.S. at 207. In this situation, administrators commonly seek "restitution" from beneficiaries under § 1132(a)(3). *See Knudson*, 534 U.S. at 212. But the generic "restitution" remedy can qualify as either legal or equitable. *See id.* at 212–13. For this remedy to be equitable, the fiduciary must seek *specific* "funds" in the beneficiaries' possession—not a money judgment collectable from any of the beneficiaries' *general* assets. *See id.* at 213–14; *see also Montanile*, 577 U.S. at 145. Thus, when beneficiaries still possessed the funds that they obtained from tortfeasors, plan administrators could seek the funds under § 1132(a)(3). *See Sereboff*, 547 U.S. at 360, 362–63. But administrators could not invoke this cause of action if the beneficiaries had already spent the funds they received from tortfeasors on nontraceable assets. *See Montanile*, 577 U.S. at 144–46.

### B. The Nature of the Participants' Requested Remedy

This law requires us to characterize the nature of the relief that the Participants seek. Before addressing that remedies question, though, we start with a liability disclaimer: it is "far from clear" that the Participants' allegations suffice to hold Regions liable under § 1132(a)(3). *Mertens*, 508 U.S. at 253. This provision does not allow the Participants to pursue "appropriate equitable relief" in the abstract; they may pursue that relief only "to redress" a violation of ERISA or the Plans or to "enforce" the law or plan terms. 29 U.S.C. § 1132(a)(3). Yet the Participants have identified no plan terms that Regions violated. Quite the opposite. To shield their state-law claims from preemption, the Participants argue that they seek to enforce the *trust agreement*, not the *Plans*. They also do not argue that Regions violated ERISA because, again, the statute exempts top-hat plans from its fiduciary-duty rules. All this said, neither party has addressed this predicate question whether the Participants even identify a "remediable wrong[.]"

*Mertens*, 508 U.S. at 254. We thus will resolve "this case on the narrow battlefield the parties have chosen" by jumping past any liability issues to the remedies question. *Id.* at 255.

So what type of relief do the Participants seek? We can immediately rule out one possibility: equitable restitution. The Participants concede that they do not (and could not) seek that form of equitable relief. Among other reasons, Regions turned over the Plans' assets to the bankruptcy court and no longer possesses them. The Participants thus seek money from the bank's "general assets," not from a specific fund. *See Montanile*, 577 U.S. at 144–45.

Instead, the Participants' complaint requested an "equitable surcharge" from Regions—a surcharge that they measured by "the amounts that should have been paid to [them] as benefits under" the Plans. Complaint, R.19, PageID 376. Was this remedy "*typically* available in equity" under the Supreme Court's cases? *Mertens*, 508 U.S. at 256. The Participants' argument that it qualifies as equitable rests on the Supreme Court decision in *Amara*. *Amara* suggested that equity courts could grant a beneficiary "monetary 'compensation' for a loss resulting from a trustee's breach of duty[.]" 563 U.S. at 441. It added that courts "sometimes" called this "monetary remedy" a "surcharge" and viewed it as "exclusively equitable." *Id.* at 442 (citation omitted).

In the years after *Amara*, several courts relied on that decision to conclude that ERISA plan participants may seek this type of monetary award against ERISA fiduciaries under § 1132(a)(3). *See Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 914–15 (11th Cir. 2022) (collecting cases). Yet the Fourth Circuit has since disagreed. *See Rose*, 80 F.4th at 499–504. It held that an "equitable surcharge" for a beneficiary's losses qualifies as a damages remedy that *Mertens* does not permit ERISA plaintiffs to recover under § 1132(a)(3). *See id.* The Fourth Circuit reasoned that equity courts could order an equitable surcharge only in trust cases when they had exclusive jurisdiction. *See id.* at 500. The court further explained that this remedy was not *typically* available in equity because equity courts could not grant it in concurrent-jurisdiction cases. *See id.*

For four reasons, we side with the Fourth Circuit. *First*, the Supreme Court has described *Amara*'s surcharge discussion as dicta that "was not essential" to its vacatur judgment.

*Montanile*, 577 U.S. at 148 n.3; *see Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 375 n.4 (6th Cir. 2015) (en banc).   In *Amara*, plan participants had alleged that a plan sponsor violated ERISA by misleading them about changes to their retirement plan.   *See* 563 U.S. at 426–30.   A district court agreed.   *Id.* at 431–32.   As for the remedy, the court reformed the terms of the changed plan to match the employer's representations and ordered the employer to pay the higher benefits that resulted.   *Id.* at 433–34.   The district court held that it could impose this remedy under the ERISA provision that allows participants to seek their benefits: § 1132(a)(1)(B).   *Id.* at 434.   On appeal, the Supreme Court reversed, holding that this separate ERISA cause of action did not give the district court the power to change the plan's terms.   *Id.* at 435–38.   Yet, in an unbriefed discussion, the Court then suggested that § 1132(a)(3) might permit the district court to reform the plan and order an equitable surcharge.   *See id.* at 438–45; *see also id.* at 447 (Scalia, J., concurring in the judgment).   Ultimately, however, the Court did not resolve this issue and instead told the district court to decide "which remedies are appropriate" on remand.   *Id.* at 442 (majority opinion).

*Second*, *Amara*'s dicta conflicts with *Mertens*'s holding.   The word "surcharge" is the label that equity courts "sometimes" used in trust cases to describe the monetary award that the law courts called damages.   Langbein, *supra*, 103 Colum. L. Rev. at 1352–53; *Rose*, 80 F.4th at 498.   The equity courts might also have used terms like "equitable compensation," "equitable damages," or simply "damages" to describe these awards.   Samuel L. Bray, *Fiduciary Remedies*, *in* The Oxford Handbook of Fiduciary Law 449, 456 (Evan J. Criddle et al. eds., 2019)).   In other words, surcharge and damages are "essentially equivalent" because they describe the same concept: "monetary relief" that a legal or equity court would grant to compensate a plaintiff for the losses that the defendant caused.   *Rose*, 80 F.4th at 498; *see* Langbein, *supra*, 103 Colum. L. Rev. at 1352–53; Bray, *supra*, *Fiduciary Remedies*, at 456.   And the Supreme Court in *Mertens* held that this remedy—"monetary relief for all losses [the participants'] plan sustained as a result of the alleged breach of fiduciary duties"—fell outside the phrase "equitable relief" in § 1132(a)(3).   508 U.S. at 255–59.   The Court reached that result even though it acknowledged that equity courts *could* grant this monetary relief (no matter its name) in trust cases within their exclusive jurisdiction.   *See id.* at 255–56.   Nothing in *Mertens* suggests that the Court would

have changed its mind if the participants had simply changed the name of their monetary remedy from *damages* to *surcharge*.  *See id.*; *Rose*, 80 F.4th at 500, 503–04.

In its dicta, *Amara* tried to distinguish *Mertens* on the ground that the defendant in *Amara* was "analogous to a trustee" while the defendant in *Mertens* was analogous to a nonfiduciary who knowingly participated in the trustee's breach.  563 U.S. at 442; *see Mertens*, 508 U.S. at 251.  But this distinction did not matter under the common law of trusts.  The equity courts in trust cases could grant monetary relief *not just* against the "trustee" for a breach of a fiduciary duty (like the defendant in *Amara*), *but also* "against third persons who knowingly participated in the trustee's breach" (like the defendant in *Mertens*).  *Mertens*, 508 U.S. at 256.  Indeed, the common-law authorities on which *Amara* relied (such as Bogert's and Pomeroy's treatises) made this point.  *See Amara*, 563 U.S. at 442.  According to Pomeroy, "[i]f third persons are parties to a breach of trust, they are equally liable with the trustee" for the money remedy.  4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1080, at 230 (5th ed. 1941); *see* George Gleason Bogert et al., *Bogert's The Law of Trusts and Trustees* § 901, Westlaw (database updated May 2025).  So *Mertens*'s logic—that the phrase "equitable relief" in § 1132(a)(3) does not include this monetary remedy because it was not "*typically* available in equity" outside trust cases— applies to claims against fiduciaries too.  No common-law basis exists for allowing courts to exercise this remedy against trustees but not against those who knowingly aid the trustee's breach.  Either the remedy should exist in both cases or it should exist in neither.  And *Mertens* took the latter course.

*Third*, our precedent also rejects this purported distinction of *Mertens*.  *See Helfrich v. PNC Bank, Ky., Inc.*, 267 F.3d 477, 480–82 (6th Cir. 2001).  In *Helfrich*, a plan participant sought money from a bank under § 1132(a)(3) for the losses that the bank's breaches of its fiduciary duties caused.  *See id.* at 479–80.  We held that the participant could not pursue this relief against the bank under § 1132(a)(3).  *See id.* at 480–82.  Like *Mertens*, we recognized that an equity court could grant "money damages" against a trustee for a breach of a fiduciary duty. *Id.* at 482.  But we recognized that *Mertens*'s logic extended from a case against a nonfiduciary for aiding a trustee's breach (the facts of *Mertens*) to a case against the trustee itself (the facts of *Helfrich*).  *See id.*  And although *Helfrich* used the term "damages" rather than "surcharge," we

fail to see why the label should matter.  Indeed, even the Participants conflate these terms.  Their briefing on the state-law claims argues that "they are seeking *damages* from Regions[.]"  Reply Br. 6.  In short, no matter the name for this money remedy, *Helfrich* holds that courts may not grant a monetary award under § 1132(a)(3) to compensate a plan participant for losses caused by a fiduciary.

This precedent matters.  We must follow *Helfrich* until the Supreme Court or our en banc court overturns it.  *See Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).  True, *Helfrich* predates *Amara*.  Also true, our caselaw allows us to reevaluate our earlier decisions based on the Supreme Court's intervening dicta.  *See United States v. Fields*, 53 F.4th 1027, 1048 & n.13 (6th Cir. 2022).   And some of our unpublished cases have mentioned surcharge in passing as a potential remedy after *Amara*.  *See Brown v. United of Omaha Life Ins*., 661 F. App'x 852, 860 (6th Cir. 2016); *Stiso v. Int'l Steel Grp*., 604 F. App'x 494, 500 (6th Cir. 2015); *see also Rochow*, 780 F.3d at 375 & n.4.  Still, we will refuse to follow the Supreme Court's dicta if we have a "substantial reason" for the refusal—such as "subsequent statements" by the Court "undermining" the "rationale" of its earlier dicta.  *Ellmann v. Baker (In re Baker)*, 791 F.3d 677, 682 (6th Cir. 2015) (citation omitted).

That brings us to our *fourth* and final point: The Supreme Court has since distanced itself from *Amara*'s dicta.  *See Montanile*, 577 U.S. at 148 n.3; *Rose*, 80 F.4th at 503–04.   In *Montanile*, the Court reaffirmed *Mertens*'s holding that legal remedies do not qualify as "equitable relief" under § 1132(a)(3) even if equity courts could grant those remedies when exercising their exclusive jurisdiction in trust cases.  577 U.S. at 149.  *Montanile* also relegated *Amara*'s dicta to a footnote clarifying that *Mertens*'s interpretation of § 1132(a)(3) "remains unchanged."  *Id.* at 148 n.3.  Because we had followed *Mertens*'s interpretation in *Helfrich*, that decision remains good law: § 1132(a)(3) does not permit plan participants to seek monetary relief from fiduciaries for the losses that they suffer because of the fiduciaries' breach of their duties.  267 F.3d at 480–82.  And *Helfrich*'s holding forecloses the Participants' request for monetary relief here.

One last point.  Even if the Participants cannot fit their relief within § 1132(a)(3), they ask us to create a new cause of action as a matter of the federal common law that courts may

develop under ERISA. They misjudge the scope of this federal common-law authority. The Supreme Court has held that courts lack any "federal common law" power "to revise the text of the statute" by creating a cause of action that Congress did not provide in § 1132(a). *Mertens*, 508 U.S. at 258 (citation omitted); *Mass. Mut. Life Ins. v. Russell*, 473 U.S. 134, 145–48 (1985). And that ERISA-specific precedent comports with the Court's general reticence to discover implied causes of actions in statutes that do not expressly contain them. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001).

The cases on which the Participants rely for this point are not to the contrary. *See Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 287 (3d Cir. 1995); *Carr v. First Nationwide Bank*, 816 F. Supp. 1476, 1487 (N.D. Cal. 1993). These cases make clear that ERISA gives us the ability to develop a "federal common law" of contracts when resolving disputes over ERISA-covered plans in suits filed under one of the causes of action in § 1132(a). *See Pilot Life*, 481 U.S. at 56; *Standard Ins.*, 115 F.4th at 525–26. So, for example, federal courts may create a substantive body of contract law that establishes the "breach of contract" rules governing ERISA disputes. *Kemmerer*, 70 F.3d at 287. But the Participants take a giant leap beyond this "restricted" principle with their suggestion that courts also have the power to add causes of action to the ones set forth in § 1132(a)(3). *Standard Ins.*, 115 F.4th at 525 (citation omitted). The Supreme Court has refused to take that leap. *Russell*, 473 U.S. at 145–48. So neither can we.

We affirm.